# Matter of A-B-, Respondent

*Decided by Attorney General June 11, 2018*

U.S. Department of Justice
Office of the Attorney General

(1) *Matter of A-R-C-G-*, 26 I&N Dec. 338 (BIA 2014) is overruled. That decision was wrongly decided and should not have been issued as a precedential decision.

(2) An applicant seeking to establish persecution on account of membership in a "particular social group" must demonstrate: (1) membership in a group, which is composed of members who share a common immutable characteristic, is defined with particularity, and is socially distinct within the society in question; and (2) that membership in the group is a central reason for her persecution. When the alleged persecutor is someone unaffiliated with the government, the applicant must also show that her home government is unwilling or unable to protect her.

(3) An asylum applicant has the burden of showing her eligibility for asylum. The applicant must present facts that establish each element of the standard, and the asylum officer, immigration judge, or the Board has the duty to determine whether those facts satisfy all of those elements.

(4) If an asylum application is fatally flawed in one respect, an immigration judge or the Board need not examine the remaining elements of the asylum claim.

(5) The mere fact that a country may have problems effectively policing certain crimes or that certain populations are more likely to be victims of crime, cannot itself establish an asylum claim.

(6) To be cognizable, a particular social group must exist independently of the harm asserted in an application for asylum.

(7) An applicant seeking to establish persecution based on violent conduct of a private actor must show more than the government's difficulty controlling private behavior. The applicant must show that the government condoned the private actions or demonstrated an inability to protect the victims.

(8) An applicant seeking asylum based on membership in a particular social group must clearly indicate on the record the exact delineation of any proposed particular social group.

(9) The Board, immigration judges, and all asylum officers must consider, consistent with the regulations, whether internal relocation in the alien's home country presents a reasonable alternative before granting asylum.

## BEFORE THE ATTORNEY GENERAL

On March 7, 2018, I directed the Board of Immigration Appeals ("Board") to refer for my review its decision in this matter, see 8 C.F.R. § 1003.1(h)(1)(i), and I invited the parties and any interested amici to submit briefs addressing questions relevant to that certification. *Matter of A-B-,* 27 I&N Dec. 227 (A.G. 2018). Specifically, I sought briefing on whether, and under what circumstances, being a victim of private criminal activity constitutes a cognizable "particular social group" for purposes of an application for asylum or withholding of removal.

For the reasons set forth in the accompanying opinion, I vacate the Board's December 6, 2016 decision and remand this case to the immigration judge for further proceedings. Consistent with the test developed by the Board over the past several decades, an applicant seeking to establish persecution on account of membership in a "particular social group" must satisfy two requirements. First, the applicant must demonstrate membership in a group, which is composed of members who share a common immutable characteristic, is defined with particularity, and is socially distinct within the society in question. And second, the applicant's membership in that group must be a central reason for her persecution. When, as here, the alleged persecutor is someone unaffiliated with the government, the applicant must show that flight from her country is necessary because her home government is unwilling or unable to protect her.

Although there may be exceptional circumstances when victims of private criminal activity could meet these requirements, they must satisfy established standards when seeking asylum. Such applicants must establish membership in a particular and socially distinct group that exists independently of the alleged underlying harm, demonstrate that their persecutors harmed them on account of their membership in that group rather than for personal reasons, and establish that the government protection from such harm in their home country is so lacking that their persecutors' actions can be attributed to the government. Because *Matter of A-R-C-G-*, 26 I&N Dec. 388 (BIA 2014), recognized a new particular social group without correctly applying these standards, I overrule that case and any other Board precedent to the extent those other decisions are inconsistent with the legal conclusions set forth in this opinion.

## OPINION

The Immigration and Nationality Act ("INA") authorizes the Attorney General to grant asylum if an alien is unable or unwilling to return to her country of origin because she has suffered past persecution or has a well-

founded fear of future persecution on account of "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(a), (b)(i). A recurring question in asylum law is determining whether alleged persecution was based on their membership in a "particular social group." Over the past thirty years, this question has recurred frequently before the Board and the courts of appeals, and the standard has evolved over time.

The prototypical refugee flees her home country because the government has persecuted her—either directly through its own actions or indirectly by being unwilling or unable to prevent the misconduct of non-government actors—based upon a statutorily protected ground. Where the persecutor is not part of the government, the immigration judge must consider both the reason for the harm inflicted on the asylum applicant and the government's role in sponsoring or enabling such actions. An alien may suffer threats and violence in a foreign country for any number of reasons relating to her social, economic, family, or other personal circumstances. Yet the asylum statute does not provide redress for all misfortune. It applies when persecution arises on account of membership in a protected group and the victim may not find protection except by taking refuge in another country.

The INA does not define "persecution on account of . . . membership in a particular social group." The Board first addressed the term in *Matter of Acosta*, 19 I&N Dec. 211, 233 (BIA 1985), where it interpreted a "particular social group" in a manner consistent with the other four grounds of persecution identified in section 1101(a)(42)(A)—race, religion, nationality, or political opinion. *Id*. The Board concluded that a "particular social group" required a "group of persons all of whom share a common, immutable characteristic" that "the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Id*. The Board noted that the "shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances, it might be a shared past experience such as former military leadership or land ownership." *Id*.

In *Matter of R-A-*, 22 I&N Dec. 906, 917–23 (BIA 1999) (en banc), the Board considered whether a victim of domestic violence could establish refugee status as a member of a particular social group consisting of similarly situated women. The Board held that the mere existence of shared circumstances would not turn those possessing such characteristics into a particular social group. *Id*. at 919. Rather, the members of a particular social group must not merely share an immutable characteristic, but must also be recognized as a distinct group in the alien's society, *id*. at 918–19, and the persecution must be motivated by membership in that social group, *id*. at 919–22. Attorney General Reno vacated that decision for reconsideration in

light of a proposed regulation, *see* 22 I&N Dec. 906, 906 (A.G. 2001), but no final rule ever issued, and the case was eventually resolved in 2009 without further consideration by the Board. Despite the vacatur of *R-A-*, both the Board and the federal courts have continued to treat its analysis as persuasive.

In the years after *Matter of R-A-*, the Board refined the legal standard for particular social groups. By 2014, the Board had clarified that applicants for asylum seeking relief based on "membership in a particular social group" must establish that their purported social group is "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Matter of M-E-V-G,* 26 I&N Dec. 227, 237 (BIA 2014). Applicants must also show that their membership in the particular social group was a central reason for their persecution. *See* 8 U.S.C. § 1158(b)(1)(B)(i); *Matter of W-G-R-,* 26 I&N Dec. 208, 224 (BIA 2014). Where an asylum applicant claims that the persecution was inflicted by private conduct, she must also establish that the government was unable or unwilling to protect her. *See, e.g., Acosta*, 19 I&N Dec. at 222.

Later that year, the Board decided *A-R-C-G-*, which recognized "married women in Guatemala who are unable to leave their relationship" as a particular social group—without performing the rigorous analysis required by the Board's precedents. 26 I&N Dec. at 389; *see id.* at 390–95. Instead, the Board accepted the concessions by the Department of Homeland Security ("DHS") that the respondent suffered harm rising to the level of past persecution, that she was a member of a qualifying particular social group, and that her membership in that group was a central reason for her persecution. *Id.* at 395.

I do not believe *A-R-C-G-* correctly applied the Board's precedents, and I now overrule it. The opinion has caused confusion because it recognized an expansive new category of particular social groups based on private violence. Since that decision, the Board, immigration judges, and asylum officers have relied upon it as an affirmative statement of law, even though the decision assumed its conclusion and did not perform the necessary legal and factual analysis. When confronted with asylum cases based on purported membership in a particular social group, the Board, immigration judges, and asylum officers must analyze the requirements as set forth in this opinion, which restates and where appropriate, elaborates upon, the requirements set forth in *M-E-V-G* and *W-G-R-*.

In this matter, the immigration judge initially denied the respondent's asylum claim, which arises out of allegations of domestic abuse suffered in El Salvador. In reversing the immigration judge's decision, the Board did little more than cite *A-R-C-G-* in finding that she met her burden of

establishing that she was a member of a particular social group. In addition to failing meaningfully to consider that question or whether the respondent's persecution was on account of her membership in that group, the Board gave insufficient deference to the factual findings of the immigration judge.

For these and other reasons, I vacate the Board's decision and remand for further proceedings before the immigration judge consistent with this opinion. In so doing, I reiterate that an applicant for asylum on account of her membership in a purported particular social group must demonstrate: (1) membership in a particular group, which is composed of members who share a common immutable characteristic, is defined with particularity, and is socially distinct within the society in question; (2) that her membership in that group is a central reason for her persecution; and (3) that the alleged harm is inflicted by the government of her home country or by persons that the government is unwilling or unable to control. *See M-E-V-G-*, 26 I&N Dec. at 234–44; *W-G-R-*, 26 I&N Dec. at 209–18, 223–24 & n.8. Furthermore, when the applicant is the victim of private criminal activity, the analysis must also "consider whether government protection is available, internal relocation is possible, and persecution exists countrywide." *M-E-V-G-*, 26 I&N Dec. at 243.

Generally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum.[1] While I do not decide that violence inflicted by non-governmental actors may never serve as the basis for an asylum or withholding application based on membership in a particular social group, in practice such claims are unlikely to satisfy the statutory grounds for proving group persecution that the government is unable or unwilling to address. The mere fact that a country may have problems effectively policing certain crimes—such as domestic violence or gang violence—or that certain populations are more likely to be victims of crime, cannot itself establish an asylum claim.

## I.

The respondent, a native and citizen of El Salvador, entered the United States illegally and was apprehended by U.S. Customs and Border Protection agents in July 2014. After being placed in removal proceedings, the respondent filed an application for asylum and withholding of removal under

---

[1] Accordingly, few such claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution. *See* 8 U.S.C. § 1225(b)(1)(B)(v) (requiring a "significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 1158 of this title [8 U.S.C. § 1158]").

the INA, 8 U.S.C. §§ 1158, 1231(b)(3), and for withholding of removal under the regulations implementing the United Nations Convention Against Torture.

The respondent claimed that she was eligible for asylum because she was persecuted on account of her membership in the purported particular social group of "El Salvadoran women who are unable to leave their domestic relationships where they have children in common" with their partners. *Matter of A-B-*, Decision Denying Asylum Application at \*8, (Immig. Ct. Dec. 1, 2015). The respondent asserted that her ex-husband, with whom she shares three children, repeatedly abused her physically, emotionally, and sexually during and after their marriage. *Id*. at \*2–3).

In December 2015, the immigration judge denied all relief and ordered the respondent removed to El Salvador. The immigration judge denied the respondent's asylum claim for four independent reasons: (1) the respondent was not credible; (2) the group in which she claimed membership did not qualify as a "particular social group" within the meaning of 8 U.S.C. § 1101(a)(42)(A); (3) even if it did, the respondent failed to establish that her membership in a social group was a central reason for her persecution; and (4) she failed to show that the El Salvadoran government was unable or unwilling to help her. *Id*. at \*4–15. The respondent appealed the immigration judge's decision to the Board.

In December 2016, the Board reversed and remanded with an order to grant the respondent asylum after the completion of background checks. *Matter of A-B-*, (BIA Dec. 8, 2016). The Board found the immigration judge's adverse credibility determinations clearly erroneous. *Id*. at \*1–2. The Board further concluded that the respondent's particular social group was substantially similar to "married women in Guatemala who are unable to leave their relationship," which the Board had recognized in *Matter of A-R-C-G-* , 26 I&N Dec. at 390. *A-B-* at \*2. Moreover, the Board held that the immigration judge clearly erred in finding that the respondent could leave her ex-husband, and that the respondent established that her ex-husband persecuted her because of her status as a Salvadoran woman unable to leave her domestic relationship. *Id*. at \*2–3. Finally, the Board determined that the El Salvadoran government was unwilling or unable to protect the respondent. *Id*. at \*3–4.

In August 2017, the immigration judge issued an order purporting to certify and administratively return the matter to the Board in light of intervening developments in the law.[2] *Matter of A-B-*, Decision and Order

---

[2] As explained in my order of March 30, *Matter of A-B-*, 27 I&N Dec. 247, 248–49 (A.G. 2018), the immigration judge's *sua sponte* order purporting to certify the matter back to the Board was procedurally defective because the immigration judge had not issued any

of Certification, (Immig. Ct. Aug. 18, 2017). The immigration judge observed that several courts of appeals had recently held that domestic-violence victims failed to prove their entitlement to asylum based on membership in particular social groups. *See id.* at *2–3 (citing *Fuentes-Erazo v. Sessions*, 848 F.3d 847, 853 (8th Cir. 2017); *Cardona v. Sessions*, 848 F.3d 519, 523 (1st Cir. 2017); *Marikasi v. Lynch*, 840 F.3d 281, 291 (6th Cir. 2016); *Vega-Ayala v. Lynch*, 833 F.3d 34, 40 (1st Cir. 2016)). The immigration judge thus believed that the precedents relied upon by the Board in its December 2016 decision were no longer good law. *A-B-* at *3–4 (Immig. Ct. Aug. 18, 2017).

In particular, the immigration judge cited the Fourth Circuit's opinion in *Velasquez v. Sessions*, 866 F.3d 188 (4th Cir. 2017), which denied the petition for review on the ground that the alien had not established that her alleged persecution was on account of her membership in a particular social group. *A-B-* at *3–4 (Immig. Ct. Aug. 18, 2017) (citing *Velasquez*, 866 F.3d at 197). Distinguishing *A-R-C-G-* because of DHS's concessions there, 866 F.3d at 195 n.5, the court in *Velasquez* reiterated that "'[e]vidence consistent with acts of private violence or that merely shows that an individual has been the victim of criminal activity does not constitute evidence of persecution on a statutorily protected ground.'" *Id.* at 194 (quoting *Sanchez v. U.S. Att'y Gen.*, 392 F.3d 434, 438 (11th Cir. 2004)). The court further noted, "'the asylum statute was not intended as a panacea for the numerous personal altercations that invariably characterize economic and social relationships.'" *Id.* at 195 (quoting *Saldarriaga v. Gonzales*, 402 F.3d 461, 467 (4th Cir. 2005)).

In a concurrence, Judge Wilkinson reiterated that the particular social groups protected from persecution under the asylum statute must be understood in the context of the other grounds for protection, which concern specific segments of the population who are marginalized or subjected to social stigma and prejudice. *Id.* at 198 (Wilkinson, J., concurring). Noting that victims of private violence were "seizing upon the 'particular social group' criterion in asylum applications," Judge Wilkinson considered the example of applicants who claim to be the victims of gang violence. Aliens seeking asylum on that basis "are often not 'exposed to more violence or human rights violations than other segments of society,' and 'not in a substantially different situation from anyone who has crossed the gang, or who is perceived to be a threat to the gang's interests.'" *Id.* at 199 (quoting *Matter of S-E-G-*, 24 I&N Dec. 579, 587 (BIA 2008)). He recognized that the Board "has previously explained that 'victims of gang violence come from all segments of society, and it is difficult to conclude that any "group,"

---

decision for the Board to review. Neither the immigration judge nor the Board has taken any other actions in this matter since the Board issued its December 2016 decision.

as actually perceived by the criminal gangs, is much narrower than the general population.'" *Id.* (quoting *M-E-V-G-*, 26 I&N Dec. at 250). The pervasive nature of this violent criminality, in Judge Wilkinson's view, suggested that membership in a purported particular social group "is often not a central reason for the threats received, but rather is secondary to a grander pattern of criminal extortion that pervades petitioners' societies." *Id.*

On March 7, 2018, pursuant to 8 C.F.R. § 1003.1(h)(1)(i), I directed the Board to refer this matter to me for my review. I invited the parties and any interested amici to submit briefs on the following question:

> Whether, and under what circumstances, being a victim of private criminal activity constitutes a cognizable "particular social group" for purposes of an application for asylum or withholding of removal.

*A-B-*, 27 I&N Dec. at 227. After certifying this case, I received party submissions from the respondent and DHS and twelve amicus briefs.

## II.

As a threshold matter, I address the respondent's procedural objections concerning my authority to review this case and the certification procedure.

## A.

The respondent argues that I lack the authority to certify the Board's decision because it did not reacquire jurisdiction following its remand to the immigration judge. In the respondent's view, the Attorney General's authority to certify and review immigration cases is restricted to cases over which the Board expressly retains jurisdiction, excluding any cases that have been remanded for further proceedings. This restrictive interpretation of my jurisdiction finds no support in the law.

Under the INA, "[t]he Attorney General enjoys broad powers with respect to 'the administration and enforcement of [the INA itself] and all other laws relating to the immigration and naturalization of aliens.'" *Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 279 (4th Cir. 2004) (quoting 8 U.S.C. § 1103(a)(1)); *see also Henderson v. INS*, 157 F.3d 106, 126 (2d Cir. 1998) ("[T]he extraordinary and pervasive role that the Attorney General plays in immigration matters is virtually unique."); *Matter of D-J-*, 23 I&N Dec. 572, 573–74 & n.3 (A.G. 2003) (describing Attorney General's review authority under 8 U.S.C. § 1226(a)). The INA grants the Attorney General the authority to "review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the

Attorney General determines to be necessary for carrying out" his duties related to the immigration and naturalization of aliens. 8 U.S.C. § 1103(g)(2). This authority includes the power to refer cases for my review, *see* 8 C.F.R. § 1003.1(h)(1), which the First Circuit has called an "unfettered grant of authority," *Xian Tong Dong v. Holder*, 696 F.3d 121, 124 (1st Cir. 2012). Nothing in the INA or the implementing regulations precludes the Attorney General from referring a case for review simply because the Board has remanded the case for further proceedings before an immigration judge.

It is likewise irrelevant that there has not been a final decision from the Board either granting or denying relief. The relevant federal regulation states: "The Board shall refer to the Attorney General for review of its decision all cases that . . . the Attorney General directs the Board to refer to him." 8 C.F.R § 1003.1(h)(1). Nothing in section 1003.1(h) requires, or even suggests, that the only Board "decisions" the Attorney General can review are *final* decisions that definitively grant or deny relief to a respondent. Nor do the applicable regulations or the INA define "decision" as a "final" decision. *See id.* § 1001.1 (defining terms in the relevant chapter); 8 U.S.C. § 1101 (defining terms under the Act).

## B.

Both the respondent and certain amici also raise due process concerns with my certification of this matter. They argue principally that my certification improperly bypassed the Board and deprived it of the opportunity to consider the certified question in the first instance. The Board exercises "only the authority provided by statute or delegated by the Attorney General," *Matter of Castro-Tum*, 27 I&N Dec. 271, 282 (A.G. 2018), and the regulations allow the Attorney General to certify any case that is before the Board or where it has rendered a decision, 8 C.F.R § 1003.1(h). In any event, the respondent has already received full and fair opportunities to present her asylum claim before both the immigration judge and the Board. After those proceedings, both the immigration judge and the Board issued written decisions that analyzed the validity of the respondent's proposed particular social group and whether the respondent qualified for asylum on that ground.

The respondent also argues that the certification violated her due process rights because alleged "irregularities" in the certification "reflect prejudgment of her claim and lack of impartiality, in contravention of her right to a full and fair hearing by a neutral adjudicator."[3] There is no basis

---

[3] The only alleged "irregularity" cited by respondent is the notion that "[g]iven that Respondent's case was not under active consideration by Judge Couch or the Board at the time of the Attorney General's referral order, it is not clear how the Attorney General

to this claim. The respondent and some amici complain that I have advanced policy views on immigration matters as a U.S. Senator or as Attorney General, but the statements they identify have no bearing upon my ability to faithfully discharge my legal responsibilities in this case. I have made no public statements regarding the facts of respondent's case, and I have no "personal interest in the outcome of the proceedings." *Strivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995).

Nor is there any requirement that an administrator with significant policymaking responsibilities withdraw from "interchange and discussion about important issues." *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1168 (D.C. Cir. 1979). As the Supreme Court has held, a decision maker need not be "disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not 'capable of judging a particular controversy fairly on the basis of its own circumstances.'" *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 493 (1976) (*quoting United States v. Morgan*, 313 U.S. 409, 421 (1941)). If policy statements about immigration-related issues were a basis for disqualification, then no Attorney General could fulfill his or her statutory obligations to review the decisions of the Board.

## III.

I turn now to the question of whether, and under what circumstances, being a victim of private criminal activity constitutes persecution on account of membership in a particular social group.[4]

## A.

An applicant for asylum bears the burden of establishing that she "is a refugee within the meaning of section 1101(a)(42)(A)" of the INA. 8 U.S.C. § 1158(b)(1)(A), (B)(i). Under that definition, the applicant must demonstrate that she is an alien outside her country of nationality "who is

---

became aware of Respondent's case." Respondent's Opening Br. at 18 n.5. The Attorney General has the express authority under the INA to review "administrative determinations in immigration proceedings." 8 U.S.C. § 1103(g)(2). The suggestion that there is something "irregular" about my exercise of that authority is meritless.

[4] The respondent in this case also applied for withholding of removal under 8 U.S.C § 1231(b)(3) and for protection under the United Nations Convention Against Torture ("CAT"), *see* 8 C.F.R. § 1208.16(c). Because the Board sustained the respondent's appeal as to her asylum claim, the Board did not address the immigration judge's denial of her applications for withholding of removal or for CAT protection. *See A-B-* at *4 (BIA). My opinion addresses only respondent's asylum claim. On remand, the immigration judge may consider any other issues remaining in the case.

unable or unwilling to return to, and is unable or unwilling to avail . . . herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id*. § 1101(a)(42)(A). Here, the respondent claims that she is eligible for asylum because of persecution she suffered on account of her purported membership in a particular social group—"El Salvadoran women who are unable to leave their domestic relationships where they have children in common" with their partners.

As the Board and the federal courts have repeatedly recognized, the phrase "membership in a particular social group" is ambiguous. *Matter of Acosta,* 19 I&N Dec. at 232–33; *Matter of M-E-V-G-*, 26 I&N Dec. at 230; *Matter of W-G-R-*, 26 I&N at 209; *see also*, *e.g.*, *Ngugi v. Lynch*, 826 F.3d 1132, 1138 (8th Cir. 2016); *Gonzalez v. U.S. Att'y Gen.*, 820 F.3d 399, 404 (11th Cir. 2016); *Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1083 (9th Cir. 2013) (en banc); *Mayorga-Vidal v. Holder*, 675 F.3d 9, 17 (1st Cir. 2012); *Valdiviezo-Galdamez v. U.S. Att'y Gen.*, 663 F.3d 582, 612 (3d Cir. 2011). Neither the INA nor the implementing regulations define "particular social group."[5] "The concept is even more elusive because there is no clear evidence of legislative intent." *Valdiviezo-Galdamez*, 663 F.3d at 594. As then-Judge Alito noted for the court, "[r]ead in its broadest literal sense, the phrase is almost completely open-ended. Virtually any set including more than one person could be described as a 'particular social group.' Thus, the statutory language standing alone is not very instructive." *Fatin v. INS*, 12 F.3d 1233, 1238 (3d Cir. 1993) (Alito, J.).

The Attorney General has primary responsibility for construing ambiguous provisions in the immigration laws. *M-E-V-G-*, 26 I&N Dec. at 230; *see also* 8 C.F.R. § 1003.1(g). The INA provides that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." 8 U.S.C. § 1103(a)(1). The Attorney General's reasonable construction of an ambiguous term in the Act, such as "membership in a particular social group," is entitled to deference. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984); *see also Negusie v. Holder*, 555 U.S. 511, 516 (2009)

---

[5] One of Congress's primary purposes in passing the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, was to implement the principles agreed to in the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 (entered into force Oct. 4, 1967; for the United States Nov. 1, 1968), as well as the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 (entered into force Apr. 22, 1954)). *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 436–37 (1987). The Protocol offers little insight into the definition of "particular social group," which was added to the Protocol "as an afterthought." *Acosta*, 19 I&N Dec. at 232.

("Consistent with the rule in *Chevron* . . . , the BIA is entitled to deference in interpreting ambiguous provisions of the INA."); *id.* at 525 (Scalia, J., concurring) (citing *Chevron* and agreeing that "the agency is entitled to answer" whether the alien is statutorily barred from receiving asylum); *Aguirre-Aguirre*, 526 U.S. at 425 ("judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations" (quotations omitted)).  Thus, every court of appeals to have considered the issue has recognized that the INA's reference to the term "particular social group" is inherently ambiguous and has deferred to decisions of the Board interpreting that phrase.[6]

The Supreme Court has "also made clear that administrative agencies are not bound by prior judicial interpretations of ambiguous statutory interpretations, because there is 'a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows.'"  *Matter of R-A-*, 24 I&N Dec. 629, 631 (A.G. 2008) (quoting *Brand X*, 545 U.S. at 982 (internal quotation and citations omitted)).  "A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."  *Brand X*, 545 U.S. at 982.

B.

In a number of opinions spanning several decades, the Board has articulated and refined the standard for persecution on account of membership in a "particular social group" so that this category is not boundless.  The Board first interpreted the term in *Matter of Acosta*, 19 I&N Dec. at 233.  Applying the canon of *ejusdem generis*, the Board concluded that the phrase "particular social group" should be construed in a manner consistent with the other grounds for persecution in the statute's definition of refugee:  race, religion, nationality, and political opinion.  *Id.*  Noting that each of these terms describes "a characteristic that either is beyond the power

---

[6]  *See*, *e.g.*, *Reyes v. Lynch*, 842 F.3d 1125, 1135 (9th Cir. 2016); *Gonzalez*, 820 F.3d at 404; *Zaldana Menijar v. Lynch*, 812 F.3d 491, 498 (6th Cir. 2015); *Cantarero v. Holder*, 734 F.3d 82, 85 (1st Cir. 2013); *Cece v. Holder*, 733 F.3d 662, 668–69 (7th Cir. 2013) (en banc); *Orellana-Monson v. Holder*, 685 F.3d 511, 520 (5th Cir. 2012); *Lizama v. Holder*, 629 F.3d 440, 446 (4th Cir. 2011); *Ngengwe v. Mukasey*, 543 F.3d 1029, 1033 (8th Cir. 2008); *Niang v. Gonzales*, 422 F.3d 1187, 1199 (10th Cir. 2005); *Ucelo-Gomez v. Mukasey*, 509 F.3d 70, 72 (2d Cir. 2007); *Fatin*, 12 F.3d at 1238–39 (3d Cir. 1993).

of an individual to change or is so fundamental to individual identity or conscience that it ought not be required to be changed," the Board concluded that persecution on account of membership in a particular social group must similarly mean "persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic." *Id*. The Board stated that this definition "preserve[d] the concept that refuge is restricted to individuals who are either unable by their own actions, or as a matter of conscience should not be required, to avoid persecution." *Id*. at 234.

In 1999, the Board, sitting *en banc*, considered for the first time "whether the repeated spouse abuse inflicted on the respondent makes her eligible for asylum as an alien who has been persecuted on account of her membership in a particular social group." *R-A-*, 22 I&N Dec. at 907. In a thorough, well-reasoned opinion, the Board first looked to the plain language of the INA to determine whether Congress intended the Act to provide asylum to battered spouses who are leaving marriages to aliens having no ties to the United States. *Id*. at 913–14. Finding no definitive answer in the language of the statute, the Board "look[ed] to the way in which the other grounds in the statute's 'on account of' clause operate." *Id*. at 914. Following that "significant guidance," the Board concluded that R-A- was not eligible for asylum for two reasons. First, her claimed social group—"Guatemalan women who have been involved intimately with Guatemalan male companions, who believe that women are to live under male domination"— did not qualify as a "particular social group" under the INA. *Id*. at 917–18. And second, even if it did qualify, she failed to show a sufficient nexus between her husband's abuse and her membership in that social group. *Id*. at 923.

The Board first observed that the purported social group appeared "to have been defined principally, if not exclusively, for purposes of this asylum case, and without regard to the question of whether anyone in Guatemala perceives this group to exist in any form whatsoever." *Id*. at 918. The Board found "little or no relation [of the purported social group] to the way in which Guatemalans might identify subdivisions within their own society or otherwise might perceive individuals either to possess or to lack an important characteristic or trait." *Id*. The Board reasoned that for a social group to be viable for asylum purposes, there must be some showing of how the immutable characteristic shared by the group is understood in the alien's home country so that the Board can "understand that the potential persecutors in fact see persons sharing the characteristic as warranting suppression or the infliction of harm." *Id*.

The Board held that a "particular social group" should be recognized and understood to be a societal faction or a recognized segment of the population

in the alien's society. *R-A-*, 22 I&N Dec. at 918. The Board found that R-A- had "shown neither that the victims of spouse abuse view themselves as members of this group, nor, most importantly, that their male oppressors see their victimized companions as part of this group." *Id.* Without such a showing, the Board concluded that "if the alleged persecutor is not even aware of the group's existence, it becomes harder to understand how the persecutor may have been motivated by the victim's 'membership' in the group to inflict the harm on the victim." *Id.* at 919.

In addition to holding that R-A-*'s* proposed group did not qualify as a "particular social group," the Board also held that she had not shown the persecution was "on account of" her membership in the group. *Id.* at 920; *see* 8 U.S.C. § 1101(a)(42)(A). Even if the Board were to accept the respondent's proposed social group, she "has not established that her husband has targeted and harmed [R-A-] because he perceived her to be a member of this particular social group." *R-A-*, 22 I&N Dec. at 920. R-A-'s husband targeted her "because she was his wife, not because she was a member of some broader collection of women, however defined, whom he believed warranted the infliction of harm." *Id.*

On January 19, 2001, Attorney General Reno summarily vacated *R-A-* and directed the Board to stay consideration of the case pending final publication of a proposed rule offering guidance on the definitions of "persecution" and "membership in a particular social group" and what it means to be "on account of" a protected characteristic. *R-A-*, 22 I&N Dec. at 906; *see also* 65 Fed. Reg. 76,588, 76,588 (Dec. 7, 2000). No final rule ever issued, however. In September 2008, Attorney General Mukasey lifted the stay and directed the Board to reconsider the case in light of intervening Board and judicial decisions. *Matter of R-A-*, 24 I&N Dec. 629, 630 (A.G. 2008). In December 2009, before the Board issued an opinion, R-A- and DHS jointly stipulated that she was eligible for asylum, resolving the case. *See A-R-C-G-*, 26 I&N Dec. at 391–92 n.12.

Despite its vacatur, both the Board and federal courts have continued to rely upon *R-A-*. In 2014, the Board stated that the 1999 opinion's "role in the progression of particular social group claims remains relevant." *M-E-V-G-*, 26 I&N Dec. at 231 n.7. In 2013, the Ninth Circuit recognized that although "*R-A-* was later vacated[,] . . . litigants and other courts have relied heavily upon its analysis." *Henriquez-Rivas*, 707 F.3d at 1090 n.11. And in 2011, the Third Circuit quoted *R-A-* at length because "*R-A-* is so important to the claim before us here." *Valdiviezo-Galdamez*, 663 F.3d at 596–97 & n.8.

In the years since *R-A-*, the Board has refined its interpretation of "particular social group" on a case-by-case basis. In *Matter of C-A-*, 23 I&N Dec. 951, 959 (BIA 2006), *aff'd sub nom. Castillo-Arias v. U.S. Att'y Gen.*,

446 F.3d 1190 (11th Cir. 2006), the Board held that a cognizable "particular social group" should generally be "easily recognizable and understood by others to constitute social groups." In *S-E-G-*, 24 I&N Dec. at 584, the Board defined the "particularity" requirement as "whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons." In *Matter of E-A-G-*, 24 I&N Dec. 591, 594 (BIA 2008), the Board further explained that "the extent to which members of a society perceive those with the characteristic in question as members of a social group—is of particular importance in determining whether an alien is a member of a claimed particular social group."

In 2014, the Board issued a pair of complementary precedential opinions, *M-E-V-G-* and *W-G-R-*, clarifying what is necessary to establish a particular social group. In those cases, the Board held that an asylum applicant claiming membership in a particular social group must "establish that the group is (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *M-E-V-G-*, 26 I&N Dec. at 234, 237; *see also W-G-R-*, 26 I&N Dec. at 212. The Board explained that those applicants also bear the burden of showing that their membership was a central reason for their persecution, and that their home government was "unable or unwilling to control" the persecutors. *W-G-R-*, 26 I&N Dec. at 224 & n.8.

Again echoing *R-A-*, the Board explained that the requirement that a group be socially distinct "considers whether those with a common immutable characteristic are set apart, or distinct, from other persons within the society in some significant way. In other words, if the common immutable characteristic were known, those with the characteristic in the society in question would be meaningfully distinguished from those who do not have it." *M-E-V-G-*, 26 I&N Dec. at 238. Members of a particular social group will generally understand their own affiliation with that group, as will other people in their country. *Id.* To be socially distinct, a particular social group "must be perceived as a group by society." *Id.* at 240.

*M-E-V-G-* also clarified that "a group's recognition for asylum purposes is determined by the perception of the society in question, rather than by the perception of the persecutor." *Id.* at 242. The Board explained that to do otherwise would create two significant problems. First, it would conflate the inquiry into whether a "particular social group" is cognizable under the INA with the separate and distinct requirement that the persecution be "on account of" membership. *Id.* Second, defining a particular social group from the perspective of the persecutor would contradict the Board's prior holding that a social group may not be defined exclusively by the fact that its members

have been subjected to harm.  *Id.* (citing *Matter of A-M-E- & J-G-U-*, 24 I&N Dec. 69, 74 (BIA 2007)).

Finally, the Board explained that this definition did not abrogate or depart from *Acosta*, 19 I&N Dec. 211, or the Board's other decisions, but rather clarified how the definition of "particular social group" had developed through case-by-case adjudication.  *See W-G-R-*, 26 I&N Dec. at 212; *M-E-V-G-*, 26 I&N Dec. at 244–47.

### C.

Although the Board has articulated a consistent understanding of the term "particular social group," not all of its opinions have properly applied that framework.  Shortly after *M-E-V-G-* and *W-G-R-*, the Board decided *A-R-C-G-*, 26 I&N Dec. 388, which held that "married women in Guatemala who are unable to leave their relationship" could constitute a particular social group, *id*. at 392.  Importantly, the Board based its decision on DHS's concessions that:  (1) A-R-C-G- suffered harm rising to the level of past persecution; (2) A-R-C-G-'s persecution was on account of her membership in a particular social group; and (3) A-R-C-G-'s particular social group was cognizable under the INA.  *Id*. at 392–95.  In fact, the only legal question not conceded by DHS was whether, under applicable Eighth Circuit law, the Guatemalan government was unwilling or unable to control her husband.  *Id*. at 395; *see also Gutierrez-Vidal v. Holder*, 709 F.3d 728, 732 (8th Cir. 2013) (asylum applicant must show that assaults were either condoned by the government or were committed by private actors that the government was unwilling or unable to control).  The Board declined to answer that question, electing instead to remand for further proceedings.

Because of DHS's multiple concessions, the Board performed only a cursory analysis of the three factors required to establish a particular social group.  The Board concluded that A-R-C-G-'s purported particular social group was "composed of members who share the common immutable characteristic of gender," and that "marital status can be an immutable characteristic where the individual is unable to leave the relationship." *A-R-C-G-*, 26 I&N Dec. at 392–93.  With respect to particularity, the Board observed that the terms defining the group—"married," "women," and "unable to leave the relationship"—had commonly accepted definitions within Guatemalan society.  *Id.* at 393.  And finally, with respect to social distinction, the Board cited evidence that Guatemala has a "culture of machismo and family violence," and that although Guatemala's criminal laws that prohibit domestic violence, "enforcement can be problematic because the National Civilian Police often failed to respond to requests for

assistance related to domestic violence." *Id.* at 394 (quotation marks omitted).

Subsequent Board decisions, including the decision certified here, have read *A-R-C-G-* as categorically extending the definition of a "particular social group" to encompass most Central American domestic violence victims. Like *A-R-C-G-*, these ensuing decisions have not performed the detailed analysis required. For instance, the Board's decision in this case offered only the conclusory statement that the respondent's proposed group was "substantially similar to that which we addressed in *Matter of A-R-C-G-*," and that the "totality of the evidence, including the 2014 El Salvador Human Rights Report, establishes that the group is sufficiently particular and socially distinct in El Salvadoran Society." *A-B-* at *2. The Board's entire analysis of the respondent's proposed particular social group consisted of only two sentences. *Id.* Other Board opinions have similarly treated *A-R-C-G-* as establishing a broad new category of cognizable particular social groups. *See, e.g.*, *Matter of D-M-R-* (BIA June 9, 2015); *Matter of E-M-* (BIA Feb. 18, 2015).

By contrast, several courts of appeals have expressed skepticism about *A-R-C-G-*. In *Velasquez v. Sessions*, the Fourth Circuit concluded that the petitioner's asylum claim concerned personal, private conflict rather than persecution on a protected ground. 866 F.3d at 197. The court distinguished *A-R-C-G-* "because, there, the Government conceded that the mistreatment suffered by the alien was, at least for one central reason, on account of her membership in a cognizable particular social group." 866 F.3d at 195 n.5 (quotation marks and alterations omitted). In *Fuentes-Erazo*, the Eighth Circuit declined to approve a particular social group of "Honduran women in domestic relationships who are unable to leave their relationships" after distinguishing *A-R-C-G-* because there "the petitioner's actual membership in the proposed particular social group was undisputed." 848 F.3d at 853. And in *Jeronimo v. U.S. Attorney General*, 678 F. App'x 796 (11th Cir. 2017), the Eleventh Circuit denied the asylum application of a woman who claimed membership in a group of "indigenous women who live with a domestic partner and who suffer abuse and cannot leave safely from that domestic partner relationship." *Id.* at 802–03. The court recognized that in *A-R-C-G-*, "DHS had conceded the petitioner had suffered past persecution and the persecution was because of membership in a particular social group." *Id*. at 802.[7]

---

[7] Other appellate courts have resisted attempts to expand *A-R-C-G-*'s reach. *See*, *e.g.*, *Menjivar-Sibrian v. U.S. Att'y Gen.*, ___ F. App'x. ___, 2018 WL 1415126, at *1 (11th Cir. Mar. 22, 2018) ("women abused by her partner she cannot control" is not a cognizable social group where defining attribute of proposed group is having suffered persecution);

IV.

*A-R-C-G-* was wrongly decided and should not have been issued as a precedential decision. DHS conceded almost all of the legal requirements necessary for a victim of private crime to qualify for asylum based on persecution on account of membership in a particular social group.[8] To the extent that the Board examined the legal questions, its analysis lacked rigor and broke with the Board's own precedents.

A.

The Board should not have issued *A-R-C-G-* as a precedential opinion because DHS conceded most of the relevant legal questions. Precedential opinions of the Board are binding on immigration judges and guide the resolution of future cases. *See* 8 C.F.R. § 1003.1(d)(1) ("[T]he Board, through precedent decisions, shall provide clear and uniform guidance to the Service, the immigration judges, and the general public on the proper interpretation and administration of the [INA] and its implementing regulations."). Yet the parties in *A-R-C-G-* decided significant legal issues on consent, and such concessions should not set precedential rules. Many of the issues that DHS conceded—such as the "existence of [the proposed] particular social group in Guatemala"—effectively stipulated key legal questions.

---

*Solorzano-De Maldonado v. Sessions*, ___ F. App'x ___, 2018 WL 1192988, at *1 (5th Cir. Mar. 7, 2018) ("single women living alone targeted by gangs for sexual abuse" does not constitute a socially distinct group in Salvadoran society); *Perez-Rabanales v. Sessions*, 881 F.3d 61, 66 (1st Cir. 2018) (finding that purported social group of "Guatemalan women who try to escape systemic and severe violence but who are unable to receive official protection" lacked particularity and social distinction"); *Vega-Ayala*, 833 F.3d at 39 ("Being in an intimate relationship with a partner who views you as property is not an immutable characteristic.").

[8] In *Matter of L-E-A-*, 27 I&N Dec. 40 (BIA 2017), the Board similarly used key concessions by DHS to recognize a particular social group that might not have withstood the rigorous legal analysis required by Board precedent. The respondent and DHS "agree[d] that the immediate family unit of the respondent's father qualifies as a particular social group" and "that if family membership is a central reason for persecuting an asylum applicant, nexus may be established." *Id.* at 42. There is reason to doubt that a nuclear family can comprise a particular social group under the statute. *See, e.g.*, *Thomas v. Gonzales*, 409 F.3d 1177, 1192 (9th Cir.) (en banc) (Rymer, J., dissenting), *rev'd*, 547 U.S. 183 (2005). Although the validity of the particular social group analysis in *Matter of L-E-A-* is beyond the scope of this opinion, the case reflects another instance where the Board purported to decide significant legal questions based upon concessions by the parties, rather than the appropriate legal analysis.

But "[p]arties may not stipulate to the legal conclusions to be reached by the court." *TI Fed. Credit Union v. DelBonis*, 72 F.3d 921, 928 (1st Cir. 1995) (internal quotation marks and alterations omitted); *see also Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281, 289 (1917) ("If the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative; since the court cannot be controlled by agreement of counsel on a subsidiary question of law."). The same principle has long applied before the Board. *Matter of A-*, 4 I&N Dec. 378, 384 (BIA 1951); *see also Sagastume v. Holder*, 490 F. App'x 712, 715–16 (6th Cir. 2012) (holding that immigration judge did not err in denying voluntary departure even though the parties had stipulated that the petitioner would qualify for such relief because "[p]arties cannot stipulate around a statutory requirement"). Given the decision's significant limitations in guiding future decisionmakers, the Board should not have designated *A-R-C-G-* as a precedential decision.

### B.

Had the Board properly analyzed the issues, then it would have been clear that the particular social group was not cognizable. The Board's approach in *A-R-C-G-* was contrary to the appropriate way that the Board has in the past, and must in the future, approach such asylum claims. By accepting DHS's concessions as conclusive, the Board in *A-R-C-G-* created a misleading impression concerning the cognizability of similar social groups, and the viability of asylum claims premised upon persecution on account of membership in such groups.

### 1.

In *A-R-C-G-*, DHS conceded that A-R-C-G- was a member of a "cognizable" social group that was both particular and socially distinct. *Id.* at 392–95. The Board thus avoided considering whether A-R-C-G- could establish the existence of a cognizable particular social group without defining the group by the fact of persecution. *M-E-V-G-*, 26 I&N Dec. at 232; *W-G-R-*, 26 I&N Dec. at 215; *see also Perez-Rabanales v. Sessions*, 881 F.3d 61, 67 (1st Cir. 2018); *Rreshpja v. Gonzales*, 420 F.3d 551, 556 (6th Cir. 2005); *Jonaitiene v. Holder*, 660 F.3d 267, 271 (7th Cir. 2011); *Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190, 1198 (11th Cir. 2006); *Moreno v. Lynch*, 628 Fed. Appx. 862, 865 (4th Cir. 2015).

To be cognizable, a particular social group *must* "exist independently" of the harm asserted in an application for asylum or statutory withholding of removal. *M-E-V-G-*, 26 I&N Dec. at 236 n.11, 243; *W-G-R-*, 26 I&N Dec.

at 215; *Perez-Rabanales*, 881 F.3d at 67; *Lukwago v. Ashcroft*, 329 F.3d 157, 172 (3d Cir. 2003). If a group is defined by the persecution of its members, then the definition of the group moots the need to establish actual persecution. For this reason, "[t]he individuals in the group must share a narrowing characteristic other than their risk of being persecuted." *Rreshpja*, 420 F.3d at 556 ("If the group with which Rreshpja is associated is defined noncircularly—i.e., simply as young attractive Albanian women—then any young Albanian woman who possesses the subjective criterion of being 'attractive' would be eligible for asylum in the United States."). *A-R-C-G-* never considered that "married women in Guatemala who are unable to leave their relationship" was effectively defined to consist of women in Guatemala who are victims of domestic abuse because the inability "to leave" was created by harm or threatened harm.

In accepting DHS's concession that this proposed particular social group was defined with particularity, the Board limited its analysis to concluding that the terms used to describe the group—"married," "women," and "unable to leave the relationship"—have commonly accepted definitions within Guatemalan society. *A-R-C-G-*, 26 I&N Dec. at 393. But that misses the point. To say that each term has a commonly understood definition, standing alone, does not establish that these terms have the requisite particularity in identifying a distinct social group as such, or that people who meet all of those criteria constitute a discrete social group. A particular social group must not be "amorphous, overbroad, diffuse, or subjective," and "not every 'immutable characteristic' is sufficiently precise to define a particular social group." *M-E-V-G-*, 26 I&N Dec. at 239. The Board's scant analysis did not engage with these requirements or show that A-R-C-G-'s proposed group was "defined by characteristics that provide a clear benchmark for determining who falls within the group." *M-E-V-G-*, 26 I&N Dec. at 239.

Social groups defined by their vulnerability to private criminal activity likely lack the particularity required under *M-E-V-G-*, given that broad swaths of society may be susceptible to victimization. For example, groups comprising persons who are "resistant to gang violence" and susceptible to violence from gang members on that basis "are too diffuse to be recognized as a particular social group." *Constanza v. Holder*, 647 F.3d 749, 754 (8th Cir. 2011); *see also*, *e.g.*, *S-E-G-*, 24 I&N Dec. at 588; *Lizama v. Holder*, 629 F.3d 440, 447 (4th Cir. 2011); *Larios v. Holder*, 608 F.3d 105, 109 (1st Cir. 2010); *Lushaj v. Holder*, 380 F. App'x 41, 43 (2d Cir. 2010); *Barrios v. Holder*, 581 F.3d 849, 855 (9th Cir. 2009). Victims of gang violence often come from all segments of society, and they possess no distinguishing characteristic or concrete trait that would readily identify them as members of such a group.

Particular social group definitions that seek to avoid particularity issues by defining a narrow class—such as "Guatemalan women who are unable to leave their domestic relationships where they have children in common"—will often lack sufficient social distinction to be cognizable as a distinct social group, rather than a description of individuals sharing certain traits or experiences. *See R-A-*, 22 I&N Dec. at 918 (holding that R-A- failed to show that her claimed social group "is a group that is recognized and understood to be a societal faction, or is otherwise a recognized segment of the population, within Guatemala"). A particular social group must avoid, consistent with the evidence, being too broad to have definable boundaries and too narrow to have larger significance in society.

DHS similarly admitted that *A-R-C-G-'s* proposed particular social group was socially distinct by conceding that it was cognizable. *A-R-C-G-*, 26 I&N Dec. at 392. In support of that concession, the Board cited evidence that Guatemala has a "culture of machismo and family violence" and that, although Guatemala has laws in place to prosecute domestic violence crimes, "enforcement can be problematic because the National Civilian Police often failed to respond to requests for assistance related to domestic violence." *Id.* at 394 (quotation marks omitted).[9] The Board provided no explanation for why it believed that that evidence established that Guatemalan society perceives, considers, or recognizes "married women in Guatemala who are unable to leave their relationship" to be a distinct social group. But the key thread running through the particular social group framework is that social groups must be classes recognizable by society at large. *See W-G-R-*, 26 I&N Dec. at 217 ("To have the 'social distinction' necessary to establish a particular social group, there must be evidence showing that society in general perceives, considers, or recognizes persons sharing the particular characteristic to be a group."). Membership in a particular tribe or clan within a society is an instructive example: those distinctions often constitute a "particular social group" because that is a "highly recognizable, immutable characteristic" that makes members recognized in society as a group. *In re H-*, 21 I&N Dec. 337, 342–43 (BIA 1996). By contrast, there is significant room for doubt that Guatemalan society views these women, as horrible as their personal circumstances may be, as members of a distinct group in society, rather than each as a victim of a particular abuser in highly individualized circumstances.

---

[9]   On this point, I note that conclusory assertions of countrywide negative cultural stereotypes, such as *A-R-C-G-*'s broad charge that Guatemala has a "culture of machismo and family violence" based on an unsourced partial quotation from a news article eight years earlier, neither contribute to an analysis of the particularity requirement nor constitute appropriate evidence to support such asylum determinations.

2.

In *A-R-C-G-*, DHS also conceded that the respondent established that she had suffered past persecution.  26 I&N Dec. at 392.  It can be especially difficult, however, for victims of private violence to prove persecution because "[p]ersecution is something a *government* does," either directly or indirectly by being unwilling or unable to prevent private misconduct.  *Hor v. Gonzales*, 400 F.3d 482, 485 (7th Cir. 2005) (emphasis in original).  Persecution under the asylum statute "does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional."  *Fatin*, 12 F.3d at 1240.

Board precedents have defined "persecution" as having three specific elements.  First, "persecution" involves an intent to target a belief or characteristic.  *See Matter of L-E-A-*, 27 I&N Dec. 40, 44 n.2 (BIA 2017) (citing *Acosta*, 19 I&N Dec. at 222).  Yet private criminals are motivated more often by greed or vendettas than by an intent to "overcome [the protected] characteristic of the victim."  *Matter of Kasinga*, 21 I&N Dec. 357, 365 (BIA 1996).  For example, in *R-A-*, R-A-'s husband targeted her "because she was his wife, not because she was a member of some broader collection of women, however defined, whom he believed warranted the infliction of harm."  22 I&N Dec. at 920.

Second, the level of harm must be "severe."  *Matter of T-Z-*, 24 I&N Dec. 163, 172–73 (BIA 2007).  Private violence may well satisfy this standard, and I do not question that A-R-C-G-'s claims of repugnant abuse by her ex-husband were sufficiently severe.

Third, the harm or suffering must be "inflicted either by the government of a country or by persons or an organization that the government was unable or unwilling to control."  *Acosta*, 19 I&N Dec. at 222.  The Board declined to address this prong of the analysis, instead remanding to the immigration judge for further proceedings to determine whether the Guatemalan government was unwilling or unable to control A-R-C-G-'s ex-husband.

An applicant seeking to establish persecution based on violent conduct of a private actor "must show more than 'difficulty . . . controlling' private behavior."  *Menjivar v. Gonzales*, 416 F.3d 918, 921 (8th Cir. 2005) (quoting *Matter of McMullen*, 17 I&N Dec. 542, 546 (BIA 1980)).  The applicant must show that the government condoned the private actions "or at least demonstrated a complete helplessness to protect the victims."  *Galina v. INS*, 213 F.3d 955, 958 (7th Cir. 2000); *see also Hor*, 400 F.3d at 485.  The fact that the local police have not acted on a particular report of an individual crime does not necessarily mean that the government is unwilling or unable to control crime, any more than it would in the United States.  There may be many reasons why a particular crime is not successfully investigated and

prosecuted. Applicants must show not just that the crime has gone unpunished, but that the government is unwilling or unable to prevent it.

3.

Finally, DHS conceded the nexus requirement by agreeing that persecution suffered by A-R-C-G- "was, for at least one central reason, on account of her membership in a cognizable particular social group." *A-R-C-G-*, 26 I&N Dec. at 392, 395. This conclusion simply does not follow from the facts of that case or similar cases. Establishing the required nexus between past persecution and membership in a particular social group is a critical step for victims of private crime who seek asylum. *See R-A-*, 22 I&N Dec. at 920–23. Yet the Board did not evaluate the conclusion that A-R-C-G- was persecuted "on account of" her status as a married woman in Guatemala who was unable to leave her relationship.

Normally, an alien seeking asylum bears the burden of establishing a nexus between the alleged persecution and one of the five statutory grounds for asylum. *See* 8 U.S.C. § 1158(b)(1)(B)(i); *Tamara-Gomez v. Gonzales*, 447 F.3d 343, 349 (5th Cir. 2006). "If the ill-treatment was motivated by something other than one of these five circumstances, then the applicant cannot be considered a refugee for purpose of asylum." *Zoarab v. Mukasey*, 524 F.3d 777, 780 (6th Cir. 2008). "In analyzing 'particular social group' claims" the Board's decisions "require that the persecution or well-founded fear of persecution be on account of, or, in other words, because of, the alien's membership in that particular social group." *R-A-*, 22 I&N Dec. at 920. The focus in determining whether an alien was persecuted "on account of" her group membership is on "the persecutors' motives"—why the persecutors sought to inflict harm. *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992). Reasons incidental, tangential, or subordinate to the persecutor's motivation will not suffice. *Matter of J-B-N- & S-M-*, 24 I&N Dec. 208, 214 (BIA 2007).

The nexus requirement is critically important in determining whether an alien established an asylum claim. That requirement is "where the rubber meets the road" because the "importance of the 'on account of' language must not be overlooked." *Cece*, 733 F.3d at 673. "Although the category of protected persons [within a particular group] may be large, the number of those who can demonstrate the required nexus likely is not." *Id.* Indeed, a "safeguard against potentially innumerable asylum claims" may be found "in the stringent statutory requirements for all asylum seekers." *Id.* at 675.

When private actors inflict violence based on a personal relationship with a victim, then the victim's membership in a larger group may well not be

338

"one central reason" for the abuse.[10]  *See*, *e.g.*, *Zoarab*, 524 F.3d at 781 ("Courts have routinely rejected asylum applications grounded in personal disputes.").  A criminal gang may target people because they have money or property within the area where the gang operates, or simply because the gang inflicts violence on those who are nearby.  *See, e.g.*, *Constanza*, 647 F.3d at 754.  That does not make the gang's victims persons who have been targeted "on account of" their membership in any social group.

Similarly, in domestic violence cases, like *A-R-C-G-*, the Board cited no evidence that her ex-husband attacked her because he was aware of, and hostile to, "married women in Guatemala who are unable to leave their relationship."  Rather, he attacked her because of his preexisting personal relationship with the victim.  *See R-A-*, 22 I&N Dec. at 921 ("the record does not reflect that [R-A-'s] husband bore any particular animosity toward women who were intimate with abusive partners, women who had previously suffered abuse, or women who happened to have been born in, or were actually living in, Guatemala").  When "the alleged persecutor is not even aware of the group's existence, it becomes harder to understand how the persecutor may have been motivated by the victim's 'membership' in the group to inflict the harm on the victim."  *Id*. at 919.

4.

In *A-R-C-G-*, the Board recognized that it had a duty to evaluate "any claim regarding the existence of a particular social group in a country . . . in the context of the evidence presented regarding the particular circumstances in the country in question," 26 I&N Dec. at 392, but it did not adequately observe that duty.  Although the immigration judge had previously denied A-R-C-G-'s applications, the Board accepted, with little or no analysis, DHS's concessions to the contrary on nearly every legal issue.  By doing so, the Board recognized a new category of asylum claims that did not satisfy the requirements set forth by the Board's precedent.

---

[10]  Even if mistreatment is suffered at the hands of a government official, there is no nexus between the purported persecution and one of the grounds for asylum if the dispute is a "purely personal matter."  *Matter of Y-G-*, 20 I&N Dec. 794, 799 (BIA 1994); *see also*, *e.g.*, *Marquez v. INS*, 105 F.3d 374, 380–81 (7th Cir. 1997) (concluding that a commercial dispute with a Philippine military officer was "apolitical"); *Iliev v. INS*, 127 F.3d 638, 642 (7th Cir. 1997) (holding that a dispute with a Bulgarian secret service agent over employment was "personal, not political").  The Board has recognized this principle for decades, including in cases involving threats of domestic violence.  *See Matter of Pierre*, 15 I&N Dec. 461, 463 (BIA 1975) (holding that a husband's threats against his wife were "strictly personal," even though he was a Haitian government official, and, thus, she did not establish persecution).

Future social group cases must be governed by the analysis set forth in this opinion.

### V.

Having overruled *A-R-C-G-*, I must vacate the Board's December 2016 decision in this case as well. The Board's cursory analysis of the respondent's social group consisted of a general citation to *A-R-C-G-* and country condition reports. Neither immigration judges nor the Board may avoid the rigorous analysis required in determining asylum claims, especially where victims of private violence claim persecution based on membership in a particular social group. Such claims must be carefully analyzed under the standards articulated in this opinion and in past Board decisions, such as *M-E-V-G-* and *W-G-R-*.

An asylum applicant has the burden of showing her eligibility for asylum, 8 C.F.R. § 208.13(a), which includes identifying a cognizable social group and establishing group membership, persecution based on that membership, and that the government was unwilling or unable to protect the respondent. The respondent must present facts that undergird *each* of these elements, and the asylum officer, immigration judge, or the Board has the duty to determine whether those facts satisfy all of the legal requirements for asylum.

Of course, if an alien's asylum application is fatally flawed in one respect—for example, for failure to show membership in a proposed social group, *see Guzman-Alvarez v. Sessions*, 701 F. App'x 54, 56–57 (2d Cir. 2017)—an immigration judge or the Board need not examine the remaining elements of the asylum claim. *See, e.g.*, *Perez-Rabanale*s, 881 F.3d at 67 ("That ends this aspect of the matter. The petitioner's failure to satisfy both the particularity and the social distinctiveness requirements defeats her attempt to qualify as a refugee through membership in a particular social group.").

Having subjected the Board's decision to plenary review, I also address several additional errors and outline other general requirements relevant to all asylum applications to provide guidance to the Board and immigration judge on remand.

### A.

First, the Board erred in finding several of the immigration judge's factual and credibility determinations to be "clearly erroneous."

Under Department regulations, the Board may not engage in fact-finding on appeals (except for taking administrative notice of commonly known facts). 8 C.F.R. § 1003.1(d)(3)(iv). Furthermore, the Board may "not engage

in *de novo* review of findings of fact determined by an immigration judge," and the immigration judge's factual findings, "including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous." *Id.* § 1003.1(d)(3)(i); *see also Turkson v. Holder*, 667 F.3d 523, 527 (4th Cir. 2012) (noting that "[t]his rule stems from a sensible understanding of the roles and abilities of the two bodies"). Notably, "where credibility determinations are at issue, . . . 'even greater deference' must be afforded to the [immigration judge]'s factual findings." *Rodriguez v. Holder*, 683 F.3d 1164, 1171 (9th Cir. 2012) (quoting *Anderson, v. Bessemer City*, 470 U.S. 564, 575 (1985)). The Board may find an immigration judge's factual findings to be clearly erroneous only if they are "illogical or implausible," or without "support in inferences that may be drawn from the facts in the record." *Id.* at 1170 (quoting *Anderson*, 470 U.S. at 577).

Furthermore, the Board "cannot, under a clear error standard of review, override or disregard evidence in the record" or rely "simply on its own interpretation of the facts." *Ridore v. Holder*, 696 F.3d 907, 917 (9th Cir. 2012). If the Board disagrees with an immigration judge's factual findings, a "conclusory pronouncement" that the findings were erroneous "does not constitute clear error review." *Id.* While the Board purported to apply the "clear error" standard in this case, I cannot simply "rely on the Board's invocation of the clear error standard." *Rodriguez*, 683 F.3d at 1170. My task is to determine whether the Board "faithfully employed the clear error standard or engaged in improper de novo review" of the immigration judge's factual findings. *Id.*

1.

Here, the Board admitted that the immigration judge identified discrepancies and omissions in the respondent's testimony, but discounted the adverse credibility determination on various grounds including that the supportive affidavits were due greater weight, that the respondent sufficiently explained some discrepancies, and that the discrepancies did not ultimately undermine the respondent's account. In so doing, the Board failed to give adequate deference to the credibility determinations and improperly substituted its own assessment of the evidence.

When an asylum applicant makes inconsistent statements, the immigration judge is uniquely advantaged to determine the applicant's credibility, and the Board may not substitute its own view of the evidence on appeal. *See Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 334 (2d Cir. 2006) ("[W]here the [immigration judge]'s adverse credibility finding is based on specific examples in the record of inconsistent statements by the

asylum applicant about matters material to his claim of persecution, or on contradictory or inherently improbable testimony regarding such matters, a reviewing court will generally not be able to conclude that a reasonable adjudicator was compelled to find otherwise." (quotation omitted)).  Under the REAL ID Act, "[t]here is no presumption of credibility" in favor of an asylum applicant.  Pub. L. No. 109-13, div. B, §§ 101(a)(3), 119 Stat. 231, 303 (2005) (codified at 8 U.S.C. § 1158(b)(1)(B)(iii)).  Furthermore, the identified inconsistencies do not have to be related to an applicant's core asylum claim to support an adverse credibility determination: "Considering the totality of circumstances, and all relevant factors, a trier of fact may base a credibility determination on . . . the consistency between the applicant's or witness's written and oral statements . . . , the internal consistency of each such statement, [and] the consistency of such statements with other evidence of record . . . , *without regard* to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other factor."  *Id.* (emphasis added).  "[O]missions, inconsistent statements, contradictory evidence, and inherently improbable testimony are appropriate bases for making an adverse credibility determination," and the existence of "only a few" such issues can be sufficient to make an adverse credibility determination as to the applicant's entire testimony regarding past persecution.  *Djadjou v. Holder*, 662 F.3d 265, 273–74 (4th Cir. 2011).

2.

The Board further erred in concluding that the immigration judge's factual findings concerning the respondent's ability to leave her relationship and El Salvador's ability to protect her were clearly erroneous.  *A-B-* at *3.  In support of his findings, the immigration judge cited evidence that the respondent was able to divorce and move away from her ex-husband, and that she was able to obtain from the El Salvadoran government multiple protective orders against him. [11]  Although the Board questioned the significance of these facts in light of other evidence, it did not establish that the immigration judge's conclusions were "illogical or implausible," or without support from the record.  *See Rodriguez*, 683 F.3d at 1170.

Instead, the Board substituted its view of the evidence for that of the immigration judge, again violating the standard of review applicable to the factual determinations of immigration judges.

---

[11] The immigration judge's findings that the respondent was able to leave her relationship on the basis of her divorce and her ability to move from the home she shared with her ex-husband, and that she was able to obtain some measure of government protection, are supported by case law considering other particular social group claims. *See, e.g.*, *Menjivar-Sibrian*, 2018 WL 1415126, at *1; *Vega-Ayala*, 833 F.3d at 39.

B.

The Board also erred when it found that the respondent established the required nexus between the harm she suffered and her group membership. Whether a purported persecutor was motivated by an alien's group affiliation "is a classic factual question," *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 247–48 (4th Cir. 2017) (internal quotation marks omitted), which the Board may overturn only if "clearly erroneous."

The Board stated that "the record indicates that the ex-husband abused [the respondent] from his position of perceived authority, as her ex-husband and the father of her children." *A-B-* at *3. From this, the Board held, in a conclusory fashion, that the "record as a whole supports a finding that the respondent's membership in the particular social group of 'El Salvadoran women who are unable to leave their domestic relationship where they have children in common' is at least one central reason that he ex-husband abused her." *Id.* While citing the standard of review, the Board did not apply it in summarily dismissing the immigration judge's findings. Moreover, the Board's legal analysis was deficient. The Board, required to find "clear error" of a factual finding, pointed to no record evidence that respondent's husband mistreated her in any part "on account of" her membership in the particular social group of "El Salvadoran women who are unable to leave their domestic relationship where they have children in common." The Board cited no evidence that her husband knew any such social group existed, or that he persecuted wife for reasons unrelated to their relationship. There was simply no basis in the Board's summary reasoning for overturning the immigration judge's factual findings, much less finding them clearly erroneous.

C.

The Board also erred when it overruled the immigration judge's finding that the respondent failed to demonstrate that the government of El Salvador was unable or unwilling to protect her from her ex-husband. This inquiry too involved factual findings to which the Board did not give proper deference. No country provides its citizens with complete security from private criminal activity, and perfect protection is not required. In this case, the respondent not only reached out to police, but received various restraining orders and had him arrested on at least one occasion. *See A-B-* at *14–15 (Immig. Ct. Dec. 1, 2015).

For many reasons, domestic violence is a particularly difficult crime to prevent and prosecute, even in the United States, which dedicates significant

resources to combating domestic violence. *See, e.g.*, Office of Justice Programs, U.S. Dep't of Justice, Extent, Nature, and Consequences of Intimate Partner Violence (2000). The persistence of domestic violence in El Salvador, however, does not establish that El Salvador was unable or unwilling to protect A-B- from her husband, any more than the persistence of domestic violence in the United States means that our government is unwilling or unable to protect victims of domestic violence. In short, the Board erred in finding, contrary to the record and the immigration judge's findings, that El Salvador was unable or unwilling to protect A-B- and that she thus had no choice but to flee the country.

## D.

The Board, immigration judges, and all asylum officers should consider the following points when evaluating an application for asylum. First, an applicant seeking asylum or withholding of removal based on membership in a particular social group must clearly indicate, on the record and before the immigration judge, the exact delineation of any proposed particular social group. *See Matter of W-Y-C- & H-O-B-*, 27 I&N Dec. 189, 190–91 (BIA 2018); *Matter of A-T-*, 25 I&N Dec. 4, 10 (BIA 2009). The immigration judge has a responsibility to "ensure that the specific social group being analyzed is included in his or her decision," as it critical to the Board's "appellate review that the proposed social group is clear and that the record is fully developed." *Matter of W-Y-C- & H-O-B-*, 27 I&N Dec. at 191. The Board must also remember that it cannot sustain an asylum applicant's appeal based on a newly articulated social group not presented before or analyzed by the immigration judge. *Id.* at 192; *see also, e.g.*, *Baltti v. Sessions*, 878 F.3d 240, 244–45 (8th Cir. 2017) (finding no jurisdiction to review a newly defined social group because the claim based on "membership in that narrowed social group" had not been raised below); *Duarte-Salagosa v. Holder*, 775 F.3d 841, 845 (7th Cir. 2014) (declining to address a particular social group raised for the first time on appeal).

Furthermore, the Board, immigration judges, and all asylum officers must consider, consistent with the regulations, whether internal relocation in the alien's home country presents a reasonable alternative before granting asylum. Asylum applicants who have "not established past persecution . . . bear the burden of establishing that it would not be reasonable for him or her to relocate, unless the persecution is by a government or government-sponsored." 8 C.F.R. § 1208.13(b)(3)(i). An immigration judge, "in the exercise of his or her discretion, shall deny the asylum application of an alien found to be a refugee on the basis of past persecution" if it is "found by a preponderance of the evidence" that "the applicant could avoid future

persecution by relocating to another part of the applicant's country of nationality, . . . and under all the circumstances, it would be reasonable to expect the applicant to do so." *Id.* § 1208.13(b)(1)(i). Beyond the standards that victims of private violence must meet in proving refugee status in the first instance, they face the additional challenge of showing that internal relocation is not an option (or in answering DHS's evidence that relocation is possible). When the applicant has suffered personal harm at the hands of only a few specific individuals, internal relocation would seem more reasonable than if the applicant were persecuted, broadly, by her country's government.

Finally, there are alternative proper and legal channels for seeking admission to the United States other than entering the country illegally and applying for asylum in a removal proceeding. The asylum statute "is but one provision in a larger web of immigration laws designed to address individuals in many different circumstances," and "[t]o expand that statute beyond its obviously intended focus is to distort the entire immigration framework." *Velasquez*, 866 F.3d at 199 (Wilkinson, J., concurring). Aliens seeking a better life in America are welcome to take advantage of existing channels to obtain legal status before entering the country. In this case, A-B- entered the country illegally, and when initially apprehended by Border Patrol agents, she stated that her reason for entering the country was "to find work and reside" in the United States. Aliens seeking an improved quality of life should seek legal work authorization and residency status, instead of illegally entering the United States and claiming asylum.[12]

## VI.

---

[12] Asylum is a discretionary form of relief from removal, and an applicant bears the burden of proving not only statutory eligibility for asylum but that she also merits asylum as a matter of discretion. 8 U.S.C. §§ 1158(b)(1), 1229a(c)(4)(A)(ii); *see also Romilus v. Ashcroft*, 385 F.3d 1, 8 (1st Cir. 2004). Neither the immigration judge nor the Board addressed the issue of discretion regarding the respondent's asylum application, and I decline to do so in the first instance. Nevertheless, I remind all asylum adjudicators that a favorable exercise of discretion is a discrete requirement for the granting of asylum and should not be presumed or glossed over solely because an applicant otherwise meets the burden of proof for asylum eligibility under the INA. Relevant discretionary factors include, *inter alia*, the circumvention of orderly refugee procedures; whether the alien passed through any other countries or arrived in the United States directly from her country; whether orderly refugee procedures were in fact available to help her in any country she passed through; whether she made any attempts to seek asylum before coming to the United States; the length of time the alien remained in a third country; and her living conditions, safety, and potential for long-term residency there. *See Matter of Pula*, 19 I&N Dec. 467, 473–74 (BIA 1987).

In reaching these conclusions, I do not minimize the vile abuse that the respondent reported she suffered at the hands of her ex-husband or the harrowing experiences of many other victims of domestic violence around the world. I understand that many victims of domestic violence may seek to flee from their home countries to extricate themselves from a dire situation or to give themselves the opportunity for a better life. But the "asylum statute is not a general hardship statute." *Velasquez*, 866 F.3d at 199 (Wilkinson, J., concurring). As Judge Wilkinson correctly recognized, the Board's recent treatment of the term "particular social group" is "at risk of lacking rigor." *Id.* at 198. Nothing in the text of the INA supports the suggestion that Congress intended "membership in a particular social group" to be "some omnibus catch-all" for solving every "heart-rending situation." *Id.*

I therefore overrule *Matter of A-R-C-G-*, 26 I&N Dec. 388 (BIA 2014) and all other opinions inconsistent with the analysis in this opinion, vacate the Board's decision, and remand to the immigration judge for further proceedings consistent with this opinion.