# United States Court of Appeals
## For the First Circuit

No. 15-2114

YESENIA DEL CARMEN VEGA-AYALA,

Petitioner,

v.

LORETTA E. LYNCH,
Attorney General of the United States,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Thompson, and Kayatta,
<u>Circuit Judges</u>.

Kevin MacMurray and MacMurray & Associates on brief for petitioner.
Colin J. Tucker, Trial Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, and Terri J. Scadron, Assistant Director, Office of Immigration Litigation, on brief for respondent.

August 10, 2016

**LYNCH**, **Circuit Judge**.  Yesenia del Carmen Vega-Ayala petitions for review of the Board of Immigration Appeals' ("BIA") affirmance of an immigration judge's ("IJ") denial of her application for asylum and withholding of removal.  Vega-Ayala argued that she had suffered past persecution in El Salvador and that she had a well-founded fear of future persecution on account of her membership in a particular social group.  She defined that group as "Salvadoran women in intimate relationships with partners who view them as property."  The BIA held that Vega-Ayala failed to establish that her proposed social group shares immutable characteristics and has social distinction, and found her ineligible for asylum or withholding of removal.  She now argues that a reasonable factfinder would be compelled to find she had proven that she is entitled to relief.  We deny her petition.

I.

Vega-Ayala is a native and citizen of El Salvador.  On March 10, 2010, she entered the United States at or near Naco, Arizona without admission or inspection and was detained by Department of Homeland Security ("DHS") officials.  After an interview on April 7, 2010, a DHS asylum officer determined that Vega-Ayala had a credible fear of persecution in El Salvador.  See 8 C.F.R. § 208.30(d).  On April 13, 2010, DHS served Vega-Ayala with a Notice to Appear, which charged her with removability pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I).  See 8 C.F.R.

- 2 -

§§ 208.30(f), 1003.14(a). An IJ issued an order of release on May 6, 2010, and Vega-Ayala has since lived with her sister in Chelsea, Massachusetts.

In her written pleadings, filed on December 1, 2011, Vega-Ayala conceded removability and indicated her intent to seek asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). On February 26, 2013, Vega-Ayala and counsel appeared before an IJ in Boston, Massachusetts (after a transfer of venue from El Paso, Texas). At this hearing for her application for relief, Vega-Ayala testified as follows:

In 2007, she met Juan Hernandez in El Salvador at a university and carried on a relationship with him for approximately eighteen months. The two never lived together during their relationship and saw each other approximately twice a week. She never visited his home, and he never prevented her from studying at the university.

Hernandez grew violent as the relationship progressed. Both in public and private, he spoke "offensive" words to her and would grab her in such a way as to "cause black and blue marks . . . on [her] arms." In the spring of 2008, Hernandez took Vega-Ayala to a hotel and raped her. She did not tell her family members about the incident because she was ashamed. Nor did she notify the police because she believed that the Salvadoran police "don't really do anything with domestic violence." Vega-Ayala became

pregnant as a result of the rape and gave birth to a daughter on January 14, 2009. Hernandez initially refused to recognize the daughter as his child.

For the last year of their relationship, Hernandez was incarcerated on an unrelated kidnapping charge. There is no record evidence that Vega-Ayala visited him in jail, but she did ask him for financial assistance. In February 2009, Hernandez purchased a house in Vega-Ayala's name, and she and her daughter lived there for approximately one year between 2009 and 2010. A man, whom Vega-Ayala believed to be Hernandez's brother, came by the house once or twice a week.

She testified that Hernandez would call and threaten her from jail every day. She said she continued to take his calls and reside at the house he purchased because she was ashamed of having his child out of wedlock and because she was afraid that he would hurt her or her family members. When Vega-Ayala left El Salvador in 2010, Hernandez was still incarcerated.

Vega-Ayala further testified that Hernandez, after being released from jail, threatened her mother. He also contacted Vega-Ayala in the United States at some point in 2012, when she last heard from him. She was afraid to return to El Salvador because she believed that Hernandez would kidnap her and demand money from her siblings who reside in the United States. She left El Salvador alone and put her daughter in the care of her mother. She is

unmarried and continues to live with her sister in Chelsea, Massachusetts. Her daughter remains in El Salvador with her mother. She admitted to telling immigration authorities, when she was initially detained in March 2010, that she had come to the United States to work and that she had no fear of returning to El Salvador. Based on this testimony, Vega-Ayala asserted that she was entitled to relief.

## II.

On February 26, 2013, the IJ denied Vega-Ayala's application for asylum, withholding of removal, and CAT protection. The IJ concluded that, for four reasons, Vega-Ayala failed to prove her eligibility for asylum. First, her purported social group was not defined with immutability. Namely, Vega-Ayala failed to show that she was unable to leave her relationship with Hernandez, without which the IJ could not find that she was "in a particular social group that she could not change or should not have been required to change as a matter of conscience." Second, Vega-Ayala's proposed group lacked the social distinction required to qualify as a particular social group, as she failed to show that Salvadoran society perceives her proposed group to be a distinct one. Third, Vega-Ayala did not prove that Hernandez abused her "on account of" her membership in a particular social group. Finally, Vega-Ayala presented no evidence that the Salvadoran government was unable or unwilling to control

Hernandez's conduct, and thus failed to meet the statutory definition of persecution. Acknowledging that there was domestic violence in El Salvador and that the country's laws against it were not well enforced, the IJ pointed out that nonetheless Hernandez had been prosecuted and incarcerated for a different criminal offense. The IJ also denied Vega-Ayala's request for withholding of removal and CAT protection.

The BIA agreed with the IJ's decision and dismissed Vega-Ayala's appeal. The BIA found that her proposed group lacked the social distinction required under the Immigration and Nationality Act ("INA") because she had not shown that its members "are considered and treated as a distinct group within [] Salvadoran society." See 8 U.S.C. § 1101(a)(42); Matter of M-E-V-G-, 26 I. & N. Dec. 227, 240 (BIA 2014). Likewise, the BIA held that Vega-Ayala failed to show immutability, as she did not demonstrate an inability to leave Hernandez.

The BIA next found that even had Vega-Ayala proposed a particular social group cognizable for asylum, she failed to prove that her membership in that group was "at least one central reason" that Hernandez would threaten or harm her. See 8 U.S.C. § 1158(b)(1)(B)(i). Affirming the IJ's determination that when Hernandez threatened Vega-Ayala, it was "for money," the BIA noted that financial motives are "not connected to a statutorily protected ground for refugee purposes" under this circuit's case

- 6 -

law.  See, e.g., Lopez de Hincapie v. Gonzales, 494 F.3d 213, 219 (1st Cir. 2007).  Lastly, the agency agreed with the IJ that Vega-Ayala failed to show the Salvadoran government's inability or unwillingness to protect her from Hernandez's mistreatment. Because Vega-Ayala never reported Hernandez's violence to the police, she gave the authorities no opportunity to protect her. Further, the evidence of Hernandez's incarceration demonstrated that he, in fact, was "not above the law."  The BIA affirmed the IJ's determination that Vega-Ayala was not eligible for asylum or withholding of removal.

This petition for review followed.[1]

### III.

"Judicial oversight in immigration cases typically focuses on the final decision of the BIA."  Alvizures-Gomes v. Lynch, No. 15-2181, 2016 WL 3923837, at *1 (1st Cir. July 21, 2016).  Where the BIA adopts portions of the IJ's opinion, we review those portions as part of the BIA's final decision. Hernandez-Barrera v. Ashcroft, 373 F.3d 9, 20 (1st Cir. 2004).

We review the agency's legal conclusions de novo, but "with some deference to the agency's expertise in interpreting both the statutes that govern its operations and its own implementing regulations."  Alvizures-Gomes, 2016 WL 3923837, at

---

[1]    Vega-Ayala does not challenge the denial of CAT protection in this petition.

- 7 -

*1 (quoting Cabrera v. Lynch, 805 F.3d 391, 393 (1st Cir. 2015)). By contrast, factual findings are reviewed under the "highly deferential" substantial evidence standard, under which we uphold the BIA's findings "so long as they are 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Nikijuluw v. Gonzales, 427 F.3d 115, 120 (1st Cir. 2005) (quoting INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992)). Here, Vega-Ayala raises no issue of law and challenges merely the agency's assessment of the facts.

In an asylum case, the applicant bears the burden of establishing that she is a "refugee" as defined by the INA. Villa-Londono v. Holder, 600 F.3d 21, 24 (1st Cir. 2010). Specifically, the applicant must demonstrate that she is unable or unwilling to return to her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Where, as here, an applicant seeks asylum based on membership in a particular social group, she must establish that the proposed group is "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." Paiz-Morales v. Lynch, 795 F.3d 238, 244 (1st Cir. 2015) (quoting M-E-V-G-, 26 I. & N. Dec. at 237). Substantial

- 8 -

evidence supports the BIA's finding that Vega-Ayala failed to show either immutability or social distinction.

An immutable characteristic is one that "members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." Mayorga-Vidal v. Holder, 675 F.3d 9, 14 (1st Cir. 2012) (quoting Matter of Acosta, 19 I. & N. Dec. 211, 233 (BIA 1985)).

We bypass the government's argument that Vega-Ayala has waived the immutability issue because Vega-Ayala's immutability claim fails in any event. Being in an intimate relationship with a partner who views you as property is not an immutable characteristic. The BIA recognized in a recent decision that "married women in Guatemala who are unable to leave their relationship" may share an immutable trait, where specific facts demonstrated a woman's inability to leave her abusive marriage. Matter of A-R-C-G-, 26 I. & N. Dec. 388, 392–95 (BIA 2014). The asylum applicant in A-R-C-G- "suffered repugnant abuse by her husband." Id. at 389. After marrying at age seventeen and having her first child, she endured weekly beatings. Id. Her husband broke her nose, burned her breast with paint thinner, and raped her. Id. Although she contacted the police numerous times, they refused to "interfere in a marital relationship." Id. When she

escaped to her father's house or to Guatemala City, the husband found her every time and forced her to return.  Id.

Vega-Ayala's facts are a far cry from the circumstances in A-R-C-G-.  Vega-Ayala could have left Hernandez.  She never lived with him.  She saw him only twice a week and continued to attend a university.  She chose to live in a home that he purchased in her name while he was in jail.  Their relationship spanned only eighteen months, and he was incarcerated for twelve of those months.  The BIA supportably concluded that Vega-Ayala failed to articulate a requisite immutable trait common to her proposed social group.

Nor did Vega-Ayala prove that her proposed group has social distinction.  This requirement considers whether members of a particular group "are set apart, or distinct, from other persons within the society in some significant way.  In other words, if the common immutable characteristic were known, those with the characteristic in the society in question would be meaningfully distinguished from those who do not have it."  Granada-Rubio v. Lynch, 814 F.3d 35, 39 (1st Cir. 2016) (quoting M-E-V-G-, 26 I. & N. Dec. at 238).

There was no evidence that Salvadoran society regards her proposed group as distinct.  Vega-Ayala's general reference to the prevalence of domestic violence in El Salvador does little to explain how "Salvadoran women in intimate relationships with

partners who view them as property" are meaningfully distinguished from others within Salvadoran society.

On these grounds alone, we deny the petition for review for the asylum issue.[2]  Denial of the petition as to withholding of removal necessarily follows.  See Orelien v. Gonzales, 467 F.3d 67, 73 (1st Cir. 2006).

The petition for review is denied.

_____

[2]    Vega-Ayala misrepresents the record when she argues that both the BIA and IJ "concluded that [she] was subject to past persecution."  The IJ merely "assume[d] for the sake of this decision that [Vega-Ayala] suffered past persecution at the hands of Juan Hernandez."  Nowhere in the BIA's or IJ's opinion, however, was there a finding of persecution.  To the contrary, both expressly found that she did not suffer persecution as defined by the INA, as she failed to prove that the Salvadoran government was unable or unwilling to control Hernandez's conduct.  Needless to say, without a finding of past persecution, the BIA was under no obligation to presume that Vega-Ayala faced a threat of future persecution.  See 8 C.F.R. § 1208.13(b)(1).