# United States Court of Appeals
## For the First Circuit

No. 17-1782

KAREN LILIANA RIVAS-DURÁN, ET AL.,

Petitioners,

v.

WILLIAM P. BARR,
UNITED STATES ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Howard, <u>Chief Judge</u>,
Torruella and Kayatta, <u>Circuit Judges</u>.

Ondine Galvez Sniffin and Law Office of Ondine G. Sniffin, on brief for petitioners.
Jason Wisecup, Trial Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Chad A. Readler, Acting Assistant Attorney General, and Bernard A. Joseph, Senior Litigation Counsel, Office of Immigration Litigation, on brief for respondent.

June 17, 2019

**TORRUELLA**, **Circuit Judge**. Appellant Karen Liliana Rivas Durán ("Rivas-Durán") fled her native El Salvador and entered the United States without inspection with her twin sons. After being detained, Rivas-Durán sought asylum, with her sons as derivative beneficiaries, claiming that the children's father threatened her on numerous occasions. The Immigration Judge ("IJ") granted Rivas-Durán's application for asylum, but the Board of Immigration Appeals ("BIA") vacated the IJ's decision and ordered her removal, holding that she was ineligible for asylum under 8 U.S.C. § 1158 or withholding of removal under 8 U.S.C. § 1231(b)(3). The BIA found that Rivas-Durán failed to establish that she suffered persecution or that she was a member of her particular social group, "women in El Salvador unable to leave a domestic relationship." Rivas-Durán now appeals. After careful review, we deny her petition.

## I. Background

On July 1, 2014, the Department of Homeland Security ("DHS") charged Rivas-Durán and her sons with removability under 8 U.S.C. § 1182(a)(6)(A)(i), as aliens present in the United States who have not been admitted or paroled. Rivas-Durán sought asylum and withholding of removal, with her sons as derivative beneficiaries of her asylum application.

In support of her I-589 Application for Political Asylum and Withholding of Removal, Rivas-Durán declared that when she was eighteen years-old she met Pedro Ernesto Burgos-Rivas ("Pedro"), and after dating him for six months she became pregnant with twins. After learning of her pregnancy, Pedro "became aggressive" and would "grab [Rivas-Durán] by her shoulders." "At that point," Rivas-Durán "told him [that they] needed to end [their] relationship[,] but he insisted on calling [her]." During that time, she lived with her father.

While Pedro visited Rivas-Durán in the hospital after she gave birth, she declared that she did not see him again until eight months later when he suddenly showed up at her father's house. During that visit, Pedro became aggressive towards Rivas-Durán after she received a phone call, slapping her and pushing her down on the sofa. After that incident, Rivas-Durán did not see Pedro for more than a year. She declared that Pedro, who was a gang member, continued to harass and threaten her intermittently until she moved to the United States. On one occasion, when the twins were three years-old, Pedro showed up at her father's house with "about 3 other gang members" and warned her that if she "didn't want to put [her] sons in danger," she should not let them wear t-shirts with the number eighteen on them as the number represented a rival gang. Rivas-Durán further declared that after

-3-

she was in the United States, Pedro's mother tracked her address, visited her, and tried to see her grandsons.

Following Rivas-Durán's merits hearing on January 6, 2016, the IJ granted her asylum claim. The IJ deemed Rivas-Durán's testimony credible and "consistent with the application she filed." The IJ concluded that Rivas-Durán had been the victim of past persecution. The IJ explained that despite the fact that "there [was] only one incident of physical harm that the respondent suffered at the hands of the father of her children," she suffered past persecution because, "although sporadic," this "was accompanied by threats and the knowledge that [Pedro] had the ability to act on these threats."

As to the one incident of physical harm, the IJ recounted the time when Rivas-Durán received a phone call while Pedro was visiting at her father's house after the twins were born. As the IJ described it, Pedro

> impulsively grabbed [Rivas-Durán] by the shoulders and threatened that, if she were not his, she would belong to no one. He slapped her across her face and pushed her down on the sofa . . . . He threatened that she was not to tell anyone that he had done so, not even her family.

Furthermore, the IJ identified two other instances of threats: 1) "[o]n one occasion," Pedro "grabbed [Rivas-Durán] by the shoulders and told her that she could not leave the relationship"; and 2) "[s]everal years later," Pedro visited

-4-

Rivas-Durán with gang-member friends and warned her that their kids could not wear either red shirts or the number eighteen as these were symbols of a rival gang. Regarding this last incident, the IJ found that Pedro "specifically brought the other gang members so that [Rivas-Durán] would be intimidated and threatened by their presence." Finally, the IJ highlighted that after Rivas-Durán left El Salvador, "Pedro's mother tracked down the twins in the United States . . ., lied to get into the building in which [Rivas-Durán] and the twins lived with [Rivas-Durán's] mother and step-father, and lied to get into the apartment." Based on these facts, the IJ concluded that "although the threats were few and the physical harm a single incident, taken together in this scenario, Pedro's collective actions signal the potential for imminent and dire danger for the respondent and the children."

Moreover, the IJ found that Rivas-Durán had shown membership in a cognizable particular social group, specifically, "women in El Salvador unable to leave a domestic relationship." The IJ explained that, "[e]ven after leaving El Salvador, her controlling partner continued to search for her." Moreover, the IJ highlighted that according to the BIA in Matter of A-R-C-G-, 26 I & N Dec. 388 (BIA 2014), "[w]hether a woman is married or unmarried, if she is unable to leave the relationship, it makes no difference in the court's view."

DHS appealed the IJ's decision to the BIA. On July 5, 2017, the BIA vacated the IJ's decision granting asylum and ordered Rivas-Durán and her children removed from the United States. It held that the IJ erred in finding that Rivas-Durán had been persecuted, as the harm she suffered did not rise to the level of persecution required to grant asylum. The BIA further found that the IJ clearly erred in finding that Rivas-Durán was a member of her particular social group, as the relationship with her ex-partner "[did] not have the hallmarks of a domestic relationship required to establish membership in a particular social group based on domestic violence."

Rivas-Durán now appeals the BIA's decision. She claims that the evidence on the record compels the IJ's finding that the harm she suffered constitutes persecution, and that the BIA failed to analyze the issue under the "clearly erroneous" standard. Further, she argues that First Circuit and BIA precedent, as well as the record, compel the IJ's conclusion that she was a member of her particular social group. As Rivas-Durán's membership in a particular social group is an indispensable element of her claims, our analysis begins and ends with it. See Aguilón-López v. Lynch, 664 Fed. App'x. 14, 19 n.2 (1st Cir. 2016) (Petitioner's "claim fails because, regardless of whether he established persecution,

he did not establish his membership in a particularized social group.").

## II. **Analysis**

We review the BIA's legal conclusions de novo, "with appropriate deference to the agency's interpretation of the underlying statute in accordance with administrative law principles." Vásquez v. Holder, 635 F.3d 563, 565 (1st Cir. 2011) (quoting Stroni v. González, 454 F.3d 82, 87 (1st Cir. 2006)). By contrast, we review factual findings under the deferential "'substantial evidence standard,' meaning that we will not disturb such findings if they are 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Aguilar-Escoto v. Sessions, 874 F.3d 334, 336-37 (1st Cir. 2017) (quoting Xin Qiang Liu v. Lynch, 802 F.3d 69, 74 (1st Cir 2015)).

An applicant can obtain asylum by proving that he or she is a refugee pursuant to section 101(a)(42)(A) of the Immigration and Nationality Act ("INA"). 8 U.S.C. § 1101, 1158. The applicant must show that she is "unable or unwilling" to return to her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (emphasis added).

-7-

To determine that a petitioner is a member of a particular social group, the petitioner must establish that the proposed group is "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." Vega-Ayala v. Lynch, 833 F.3d 34, 39 (1st Cir. 2016) (quoting Paiz-Morales v. Lynch, 795 F.3d 238, 244 (1st Cir. 2015)). "An immutable characteristic is one that 'members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.'" Id. (quoting Mayorga-Vidal v. Holder, 675 F.3d 9, 14 (1st Cir. 2012)).

In order to meet the particularity requirement, "a group must be 'discrete and have definable boundaries-- it must not be amorphous, overbroad, diffuse or subjective.'" Paiz-Morales, 795 F.3d at 244 (citing Matter of M-E-V-G-, 26 I. & N. Dec. 227, 239 (BIA 2014)). Finally, social distinction refers to "whether those with a common immutable characteristic are set apart, or distinct, from other persons within the society in some significant way." Matter of M-E-V-G-, 26 I. & N. Dec. at 238. In other words, a socially distinct group is one that is recognized or perceived as such within the petitioner's society. Id. In 2014, the BIA held that "married women in Guatemala who are unable to leave their relationship" can constitute a cognizable particular social group

-8-

that forms the basis of a claim for asylum or withholding of removal.  Matter of A-R-C-G-, 26 I. & N. Dec. 388 (BIA 2014). Rivas-Durán's application for asylum was based on a social group allegedly analogous to that of Matter of A-R-C-G-.[1]

On appeal, Rivas-Durán challenges the BIA's determination that the IJ "clearly erred in determining that [she] is a member of a particular social group [of] 'women in El Salvador unable to leave a domestic relationship.'"  She argues that the record compelled the IJ's finding that she fits within that proposed social group.  She contends that she indeed was in a domestic relationship, even though she did not live with Pedro. She explains that her relationship with Pedro "was a domestic relationship in that they had two children together, they both had feelings for one another, Pedro expressed concern for her as the mother of his children, [she] expressed jealousy at learning of

---

[1]  After this appeal was filed, the Attorney General overruled Matter of A-R-C-G-, finding that "without performing the rigorous analysis required by the [BIA's] precedents," it recognized "an expansive new category of particular social groups based on private violence."  Matter of A-B, 27 I & N Dec. 316, 317, 319 (A.G. 2018). None of the parties request remand for application of Matter of A-B in the first instance.  In any case, we need not remand, as the BIA found that Rivas-Durán did not prove that she was a member of her proposed social group, even when Matter of A-R-C-G- was still in effect, and the intervening case would not change that result. Here, we need not reach the question of whether Rivas-Durán's proposed social group was cognizable, which is where Matter of A-R-C-G would come into play.

his other relationships and still imagines being with him as parents to their twins." Furthermore, she stresses that "Pedro, verbally and physically, from 2010 until 2015, expressed his belief that [she] belonged to him, despite her expression of having 'ended it' in 2010." Finally, she contends that, even if she never lived with Pedro, "further evidence of [her] inability to leave the relationship are the unsuccessful attempts she made to end her communication with Pedro." Her arguments are unpersuasive.

The BIA's holding that the IJ clearly erred is "a legal determination that the evidence in the record was insufficient as a matter of law to support the IJ's factual finding." Rosales Justo v. Sessions, 895 F.3d 154, 161 (1st Cir. 2018). Thus, "because the BIA's holding that the IJ committed clear error is legal in nature, our review of that conclusion is de novo." Id. at 162. We conduct de novo review "of the justifications provided by the BIA for concluding that the IJ's finding . . . was clearly erroneous." Id.

We agree with the BIA that "the record was insufficient as a matter of law to support the IJ's factual finding" that Rivas-Durán fit within her proposed social group. Id. at 161. The BIA highlighted that Rivas-Durán and Pedro never lived together, were not married or engaged, and that although her ex-partner harassed her intermittently over various years, her relationship did not

-10-

"have the hallmarks of a domestic relationship required to establish membership in a particular social group." The record supports this determination.

First, Cortez-Cardona v. Sessions, 848 F.3d 519 (1st Cir. 2017), discredits Rivas-Durán's interpretation of what qualifies as a "domestic" relationship. In Cortez-Cardona, the asylum applicant had been in an abusive relationship with a gang member. Id. at 520. She maintained that she belonged to two proposed social groups: "Guatemalan women in domestic relationships who are unable to leave" and "women who are viewed as property by virtue of their positions within a domestic relationship." Id. at 523. The BIA emphasized the definition of "domestic," which included "devoted to home life or household affairs," and found that Cortez-Cardona was not in a domestic relationship where she had dated her ex-partner for various months and after that refused his offer to "be his woman." Id. at 523. We upheld the BIA's stance. Id. at 523-24.

Moreover, the BIA cited Vega-Ayala v. Lynch, 833 F.3d 34 (1st Cir. 2016), which also supports denial of Rivas-Durán's petition. Vega-Ayala argued that she had been persecuted because of her membership in the particular social group of "Salvadoran women in intimate relationships with partners who view them as property." Id. at 36. The BIA found, and this court sustained,

-11-

that Vega-Ayala failed to show that her proposed social group was immutable, as she had not demonstrated an inability to leave her partner.  Id. at 39.  This court distinguished Vega-Ayala's case from Matter of A-R-C-G- in that she

> never lived with [her partner].  She saw him only twice a week and continued to attend a university.  She chose to live in a home that he purchased in her name while he was in jail.  Their relationship spanned only eighteen months, and he was incarcerated for twelve of those months."

Id.

As in Vega-Ayala and Cortez-Cardona, and unlike the applicant in Matter of A-R-C-G-, it is undisputed that Rivas-Durán never lived with Pedro, but rather chose to live with her father.  Pedro never forced her to leave her father's house to stay with him.  She was only in contact with Pedro when he sporadically tried to contact her or visit her and the twins in her father's home.  And Rivas-Durán has provided no authority for her proposition that she was in a domestic relationship merely because she bore Pedro's children and they "had feelings for one another."[2]

---

[2]  Rivas-Durán contends that a woman's marital status should not be "the determinative factor" in deciding her domestic violence asylum claim.  As was the case in Cortez-Cardona, 848 F.3d at 523, the BIA here focused on whether the relationship was "domestic," not on whether Rivas-Durán was married.  Rivas-Durán does not point to, and we did not find, anything in the record or the BIA's decision that suggests that marriage was the determining factor in the BIA's decision.  Thus, we need not linger on this undeveloped argument.

Hence, hers was not a "domestic" relationship, as has been interpreted by the BIA and this court.[3]

### III.  Conclusion

For the reasons discussed above, we deny Rivas-Durán's petition.  See Cortez-Cardona, 848 F.3d at 523 (finding that the record supported the BIA's determination that petitioner "had not demonstrated factually that she fit within her own proposed social groups").

---

[3]  The same reasoning is dispositive of petitioner's claim for withholding of removal.  As with asylum, an alien seeking withholding of removal must show that any persecution is on account of one of the protected grounds, including membership in a "legally cognizable social group."  Paiz-Morales, 795 F.3d at 245 (noting that withholding of removal "requires a showing that an alien is more likely than not to face persecution on account of a protected ground," and that "[a] petitioner who cannot clear the lower hurdle for asylum will necessarily fail to meet the higher bar for withholding of removal").