# United States Court of Appeals
## For the First Circuit

No. 23-1266

ANA LUISA DONIS-HERNANDEZ DE CABRERA, GUSTAVO ADOLFO
CABRERA-BLANCO, GUSTAVO EMILIANO CABRERA-DONIS, JENNIFER MELISSA
CABRERA-DONIS,

Petitioners,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE BOARD OF IMMIGRATION
APPEALS

Before

Gelpí, Selya, and Thompson,
Circuit Judges.

Robert F. Weber, with whom Randy Olen was on brief, for
petitioners.
Carlton Frederick Sheffield, with whom Brian M. Boynton,
Principal Deputy Assistant Attorney General, Civil Division, Erica
B. Miles, Assistant Director, Office of Immigration Litigation,
and Duncan T. Fulton, Trial Attorney, Office of Immigration
Litigation, were on brief, for respondent.

May 2, 2024

**THOMPSON, Circuit Judge.** After being subjected to an extortion attempt and death threat to her family, Ana Luisa Donis-Hernandez de Cabrera ("Cabrera") fled her home country of Guatemala with her family -- her husband Gustavo Adolfo Cabrera-Blanco ("Cabrera-Blanco") and their two children, Jennifer Melissa Cabrera-Donis ("Jennifer") and Gustavo Emiliano Cabrera-Donis ("Gustavo") -- in tow. They fled to the United States, where Cabrera applied for asylum (for herself and for her husband and children as derivatives), withholding of removal, and protection under the Convention Against Torture ("CAT").[1] Finding these applications lacking in certain crucial respects, an Immigration Judge ("IJ") denied them across the board -- a decision which the Board of Immigration Appeals ("BIA") affirmed on appeal. Positive that the BIA and IJ (collectively, "the agency") made some mistakes along the way, Cabrera and her family filed a

---

[1] Now is as good a time as any to explain this whole "derivative" business. When a noncitizen has been granted asylum, immigration law allows their spouse and children (who meet certain statutory criteria) to be granted asylum as derivatives. 8 U.S.C. § 1158(b)(3)(A). In contrast, no such explicit benefit exists for withholding of removal and CAT protection. See 8 C.F.R. § 1208.16(b), (c). In practice, this means "derivative claims cannot be prosecuted for withholding of removal or protection under the CAT." Mariko v. Holder, 632 F.3d 1, 3 n.1 (1st Cir. 2011). What this all means here is that if Cabrera is granted or denied asylum, Cabrera-Blanco, Jennifer, and Gustavo are granted or denied asylum along with her. And any decision on Cabrera's applications for withholding of removal and CAT protection (either a grant or a denial) do not apply to them. Neither Cabrera-Blanco, Jennifer, nor Gustavo filed separate applications for asylum, withholding of removal, or CAT protection.

petition for review with this court, with Cabrera as Lead Petitioner and Cabrera-Blanco, Jennifer, and Gustavo as Derivative Petitioners (collectively, "Petitioners").  Although they ask us to step in and correct what the agency allegedly got wrong, we ultimately find no reversible error and therefore deny the petition.  But before getting into our reasons for doing so, here's the 411 as to how Petitioners came to be in the United States and how their case got to us.

## THE 411

In recounting Petitioners' story, we lift the facts from the administrative record, including Cabrera's and Cabrera-Blanco's testimony, which the IJ deemed credible.[2] Martínez-Pérez v. Sessions, 897 F.3d 33, 37 n.1 (1st Cir. 2018).

*How Petitioners Came to Be in the United States*

After they married in 2009, Cabrera and Cabrera-Blanco began living together at his family home in San Gaspar, Zone 16, Guatemala City.  Over the next few years, the couple had two children, Jennifer and Gustavo,[3] and the four of them continued living in Cabrera-Blanco's family home in San Gaspar.

---

[2] The IJ made no credibility determinations as to Jennifer and Gustavo because they did not testify.

[3] The couple has since had a third child, who was born in the United States, and is, accordingly, not a Petitioner in today's appeal.

- 3 -

In the spring of 2017, "hoping to have a better economic[] situation for [her] family," Cabrera decided to open a second-hand clothing store, selling used clothing from the United States. She ran the business from inside the family home but did not publicly display or advertise the store and its merchandise on the street. Rather, Cabrera created a Facebook page and advertised her business there and through word of mouth. Advertising her business in this way, however, wasn't by choice. To the contrary, because gangs, like the Mara 18 gang, frequently extorted business owners in San Gaspar, Cabrera decided to run and advertise her business on the down-low out of fear of being extorted.

Her efforts, it turns out, were in vain. On Saturday, September 16, 2017, while Cabrera-Blanco was at work and Cabrera was at home with the children, an individual threw a cell phone into the home through a window. The cell phone soon began to ring and Cabrera, thinking one of her customers had left it behind, answered it. On the other end of the line, a man identified himself as a member of the Mara 18 gang and demanded that she pay the gang 10,000 Quetzales in a week's time "because [she] was running a business." If she did not cough up the money, he warned, the gang would kill Cabrera-Blanco, Jennifer, and Gustavo. To show that they were serious and could kill them if they wanted to, the Mara 18 gang member explained that he knew where Cabrera-Blanco

- 4 -

worked and where Jennifer went to school. Understandably scared out of her mind, she said, "Okay," and hung up.

Still in shock and in fear, Cabrera immediately called Cabrera-Blanco at work, but she couldn't get through to him and left him a message. When Cabrera-Blanco finally returned her call, Cabrera explained what happened and he came home right away. At home, they discussed what to do next. They decided not to go to the police out of fear that the Mara 18 gang would find out and kill them. Left with no other choice because "[w]ith those gangs you don't play," they decided to leave Guatemala altogether and go to the United States where Cabrera-Blanco's father lived. Cabrera-Blanco quit his job at a call center, Jennifer was taken out of school (despite having only a month left in her first year in primary school), and the family left their home, cars, and belongings in the care of other family members. Petitioners left Guatemala on the following Tuesday, September 19, 2017. They made it to the United States on or around September 29, 2017.

Upon arrival, Cabrera voiced her fear of returning to Guatemala due to the death threats from the Mara 18 gang, so the Department of Homeland Security ("DHS") referred her to an asylum officer for a credible fear interview ("CFI"). Deeming her fear credible, the asylum officer referred Petitioners to the immigration court for removal proceedings, during which they could seek asylum and related relief.

*How Petitioners' Case Got to Us*

Less than two years later on August 21, 2019, Petitioners appeared before the IJ to make their case for immigration relief. Cabrera applied for asylum, withholding of removal, and CAT protection. And, as we explained above, she listed Cabrera-Blanco, Jennifer, and Gustavo as derivatives of her asylum application, but they did not otherwise submit their own applications.

Before the IJ, Cabrera claimed she was persecuted in the past and had a well-founded fear of future persecution in Guatemala on account of two protected grounds: her membership in the particular social group ("PSG") of "small business proprietors who have been subjected to extortion demands upon threat of death to family including children by gangs in Colonia Gaspar, Zone 16, Guatemala City, Guatemala" and her anti-gang political opinion (more on what this all means and why it matters in a bit). At the hearing, Cabrera and Cabrera-Blanco were the only witnesses to provide testimony and they testified in line with everything we relayed above. Cabrera-Blanco also testified that after they left Guatemala, a man named Israel Robledo ("Robledo"), who owned a nearby taco shop, rented their home. The Mara 18 gang extorted Robledo too and eventually killed one of his employees, Ludwin Estuardo Valenzuela Reyes ("Valenzuela").

To support their claims and testimony, Petitioners offered (among other things) the following evidence: Cabrera's

asylum application; Cabrera's CFI documents; sworn statements from Cabrera and Cabrera-Blanco, detailing what happened to them; a sworn statement from Valenzuela's mother, corroborating his death; a sworn statement from another mother whose son, Gustavo Adolfo Istupe Ruano ("Istupe"), was killed as a result of an extortion; a sworn statement from a man who witnessed the cell phone being thrown into Cabrera's home; death certificates for Valenzuela and Istupe; employment verification for Cabrera-Blanco's job at the call center; a letter from Cabrera-Blanco's supervisor, corroborating that Cabrera-Blanco informed him he had to leave Guatemala immediately; pictures of violent incidents in San Gaspar; a copy of the Facebook page for Cabrera's business; and four country conditions reports.

Notwithstanding Cabrera and Cabrera-Blanco's testimony (and remember, the IJ deemed their testimony credible) and their supporting evidence, the IJ issued an oral decision that same day, denying asylum, withholding of removal, and CAT protection and ordering removal to Guatemala. Kicking things off with asylum, the IJ concluded that Cabrera's proposed PSG of "small business proprietors who have been subjected to extortion demands upon threat of death to family including children by gangs in Colonia Gaspar, Zone 16, Guatemala City, Guatemala" was not a legally valid PSG for three reasons. First, she reasoned that it was not an immutable characteristic, because "[o]ne could own a business and

- 7 -

then close it down." Second, the IJ explained that the PSG was not socially distinct because there was no evidence in the record that Guatemalan society viewed the PSG as a distinct group. Third, she noted that the PSG was circular in the sense that it was partly defined by the harm feared -- namely, being "subjected to extortion demands upon threat of death."

The IJ's asylum analysis did not end there. She further explained that Cabrera's anti-gang political opinion could not be a basis for asylum because "[o]pposition to gangs is not a political opinion." Therefore, according to the IJ, Cabrera could not establish past persecution or a well-founded fear of future persecution on account of a protected ground -- whether that protected ground be membership in a PSG or political opinion. To round out her asylum analysis, the IJ indicated that there was no connection (or "nexus," as we refer to it in the immigration-law world) between the harm Cabrera feared and a protected ground. In her view, the evidence simply reflected "widespread violence affecting all [Guatemalan] citizens."

The IJ then turned her attention to withholding of removal and CAT protection. With no protected ground -- membership in a PSG, political opinion, or otherwise -- to anchor Cabrera's withholding claim, the IJ denied this form of relief too. Also on this score, the IJ reasoned that Cabrera necessarily didn't satisfy her burden for withholding of removal because she didn't satisfy

her burden for asylum, which has a lower burden than withholding. As for protection under the CAT, the IJ explained that Cabrera couldn't show the necessary state action or acquiescence because she only feared harm from the Mara 18 gang and "d[id] not fear harm from government officials."

Spotting some alleged errors in the IJ's decision, Petitioners filed a timely appeal to the BIA. On appeal, though, they changed their tune in regard to the proposed PSG. In their brief to the BIA, they described the PSG as just "[b]usiness [o]wners," not "small business proprietors who have been subjected to extortion demands upon threat of death to family including children by gangs in Colonia Gaspar, Zone 16, Guatemala City, Guatemala."

On February 27, 2023, the BIA issued a decision dismissing the appeal. While the BIA adopted and affirmed the IJ's decision, it also added a few takes of its own. First, the BIA affirmed what it characterized as the IJ's "finding that [Cabrera] did not suffer harm rising to the level of past persecution, as threats and extortion do not generally amount to persecution."[4] Second, it concluded that the PSG of "small

---

[4] It's worth noting that the IJ didn't actually make the finding that the BIA said she did. The proof is in the (transcribed) pudding (i.e., the transcript of the IJ's oral decision): "The Court finds that while threats of death, if the threat is credible and imminent, can amount to harm of sufficient severity to amount to persecution that in this case [Petitioners]

business owners" was not cognizable because "business ownership is not an immutable characteristic." Nowhere in its decision, however, did the BIA address the fact that "small business owners" was not the PSG proposed to the IJ or the PSG proposed in Petitioners' BIA briefing. Third, the BIA concluded that Petitioners didn't show the necessary "nexus between the threats [Cabrera] received and her membership in a [PSG], political opinion, or another protected ground." Fourth, on the political-opinion front, the BIA explained that Cabrera's "opposition to or refusal to cooperate with criminal gangs does not constitute a political opinion or show that the gang targeted her on account of her political opinion." Fifth, it explained that, because Cabrera failed to meet the lower asylum burden, she couldn't establish her eligibility for withholding. Sixth and finally, the BIA reviewed Cabrera's CAT claim with fresh eyes (or, for the lawyers in the room, de novo). It determined that Cabrera's evidence was insufficient because "[e]vidence of widespread corruption and ineffective policing are insufficient to establish [Cabrera's] burden of proof." It also noted that Cabrera had not been tortured in the past by or with the acquiescence of any Guatemalan government official, or shown that such an official

---

have failed to demonstrate that the harm that they fear is connected to one of the protected grounds." The IJ, accordingly, never decided whether the harm Cabrera suffered rose to the level of persecution.

would acquiesce to her potential future torture by the Mara 18 gang.

Hoping to prevent their removal back to Guatemala, Petitioners filed a timely petition for review and brought their case to our bench.

## THE MERITS

With the factual and procedural 411 laid out, we shift our focus to the merits of Petitioners' appeal. Naturally, Petitioners attack -- and the government defends -- the agency's denial of asylum, withholding of removal, and CAT protection. For our part, we'll run through Petitioners' challenges and applications for immigration relief in that order, but first things first: We lay out our standard of review.

As the BIA's decision is the final agency decision on the books, we ordinarily focus our review there. See Ferreira v. Garland, 97 F.4th 36, 45 (1st Cir. 2024). Where "the BIA deferred to or adopted the IJ's reasoning," though, "we review those portions of the IJ's decision" too. Id. at 46 (quoting Chavez v. Garland, 51 F.4th 424, 429 (1st Cir. 2022)). In conducting this review, "[w]e review the agency's legal conclusions de novo," though we do afford "some deference to its interpretations of statutes and regulations related to immigration matters." Espinoza-Ochoa v. Garland, 89 F.4th 222, 230 (1st Cir. 2023) (quoting Aldana-Ramos v. Holder, 757 F.3d 9, 14 (1st Cir. 2014)).

On the other hand, factual findings get the substantial-evidence treatment, which means "[t]o reverse . . . 'the evidence must not only support the contrary finding, but compel it.'" Caz v. Garland, 84 F.4th 22, 28 (1st Cir. 2023) (quoting Mahmoud v. Barr, 981 F.3d 122, 126 (1st Cir. 2020)).

*Asylum*

Petitioners argue that the agency committed a whole host of alleged errors in denying them asylum and urge us to remedy those wrongs. These alleged errors include that (1) the BIA erred in determining that the harm Cabrera suffered did not amount to past persecution; (2) the agency erred in concluding that Cabrera had not demonstrated a well-founded fear of future persecution; and (3) the agency erred in deciding Cabrera's proposed PSG was not legally cognizable. We'll limit our analysis of Petitioners' asylum claim to only that third alleged error because, if the PSG was indeed not legally cognizable, their asylum claim necessarily fails. See, e.g., Caz, 84 F.4th at 27 (limiting asylum analysis to one issue, "which is dispositive of the whole petition"); Hernandez-Martinez v. Garland, 59 F.4th 33, 38 (1st Cir. 2023) (same). A primer on some of the A, B, C's of asylum law demonstrates why.

To be granted asylum, the applicant has the burden of demonstrating several things. High on that list is that they were persecuted in the past or have a well-founded fear of future

- 12 -

persecution in their home country on account of at least one of five statutorily protected characteristics: race, religion, nationality, membership in a PSG, or political opinion. See De Pena-Paniagua v. Barr, 957 F.3d 88, 92 (1st Cir. 2020) (quoting 8 U.S.C. § 1101(a)(42)(A)). Thus, a statutorily protected ground is a basic prerequisite to any asylum claim. This all means that, assuming the harm Cabrera endured did amount to past persecution and she had a well-founded fear of future persecution, if that persecution wasn't or won't be on account of her membership in her proposed PSG,[5] Petitioners' entire asylum claim falls apart regardless.

But before getting into the weeds of our PSG analysis, there's one wrinkle we need to iron out given some of Petitioners' procedural contortions. Recall that the record reflects three different variations of the PSG: (1) "small business proprietors who have been subjected to extortion demands upon threat of death to family including children by gangs in Colonia Gaspar, Zone 16, Guatemala City, Guatemala," which Petitioners proffered before the IJ; (2) "[b]usiness [o]wners," which they proffered in their BIA

---

[5] While Petitioners argued before the BIA and IJ that Cabrera also suffered past persecution and had a well-founded fear of future persecution on account of her political opinion, they do not challenge the denial of the political-opinion-based claim on appeal to us. So, any argument Petitioners might have had on that front is waived, see Dias Gomes v. Holder, 566 F.3d 232, 233 (1st Cir. 2009), and their hopes for winning asylum rest solely on PSG membership.

- 13 -

briefing; and (3) "small business owners," which the BIA addressed without explaining why it was addressing that PSG.[6] This leaves us with one question: Which PSG (if any) is properly before us?

The parties disagree about which PSG is before us and view the record quite differently. Petitioners argue that the only PSG before this court and the only PSG which they are relying upon on appeal is "small business owners," because that is how the BIA described the PSG. While the BIA did not explain why it described the PSG as "small business owners," Petitioners' counsel explained at oral argument that the BIA likely did so because it omitted the circular language in the PSG formulation before the IJ -- namely, "who have been subjected to extortion demands upon threat of death to family including children by gangs" -- and was left simply with "small business owners." In Petitioners'

_____

[6] To the extent Petitioners' passing reference in their briefing to "female small business ownership" was an attempt to market their PSG as solely "female small business owners," that claim is unexhausted because it was never presented to the agency. See Chun Mendez v. Garland, 96 F.4th 58, 66 (1st Cir. 2024) ("Chun Mendez did not raise a theory of imputed membership before the IJ, nor did she do so before the BIA. . . . Accordingly, because Chun Mendez surfaces her theory of imputed membership for the first time in the petition for judicial review, this claim is unexhausted."). Exhaustion in the immigration context refers to the statutory (but non-jurisdictional) requirement that a noncitizen present their claims to the agency -- thereby, "exhaust[ing] all administrative remedies available to [them] as of right" -- before a circuit court reviews any final order of removal. 8 U.S.C. § 1252(d)(1); Santos-Zacaria v. Garland, 598 U.S. 411, 416 (2023); Manguriu v. Garland, 86 F.4th 491, 500 n.14 (1st Cir. 2023).

- 14 -

counsel's view, the BIA did this in compliance with circuit-level authority (including some of our own) that endorses a "require[ment that] the BIA . . . strike the circular language and 'consider whether a petitioner's social group is cognizable if it is defined without reference to the fact of persecution.'" Espinoza-Ochoa, 89 F.4th at 233 (quoting Diaz-Reynoso v. Barr, 968 F.3d 1070, 1080-81 (9th Cir. 2020)). According to Petitioners' counsel, therefore, the BIA and IJ reviewed the same PSG and the BIA just simply struck the circular language.

The government flatly disagrees and argues that the only PSG before this court is "small business proprietors who have been subjected to extortion demands upon threat of death to family including children by gangs in Colonia Gaspar, Zone 16, Guatemala City, Guatemala," because that was the PSG presented to the IJ. It highlights that the BIA has explained elsewhere that it will not consider on appeal new PSG formulations that are "substantially different" from the formulation presented before the IJ. Matter of W-Y-C- & H-O-B-, 27 I. & N. Dec. 189, 191-93 (B.I.A. 2018). In the government's view, therefore, by analyzing the "small business owners" PSG in its decision, the BIA was explaining that even had the PSG been more narrowly described as just "small business owners," it would also fail.

To add to the complexity, while both parties argue their preferred PSG is the proper PSG before us, neither party explicitly

addresses whether either of their preferred PSG choices was properly exhausted. Ultimately, though, we leave these questions unanswered today, address (as Petitioners ask us to) only the PSG of "small business owners," and assume (favorably to Petitioners) that this PSG has been exhausted because, as we will explain, this claim fails anyway.[7] See Reyes Pujols v. Garland, 37 F.4th 1, 5 (1st Cir. 2022) (assuming petitioner exhausted their contention, because ultimately "the contention is without merit").

With the "small business owners" PSG in hand, we turn (finally) to the nitty-gritty of our analysis. For a PSG to be legally cognizable, an asylum applicant must make a three-part showing: the proposed PSG must (1) bear "a common immutable characteristic," (2) be "defined with particularity," and (3) be considered "socially distinct within the society in question." Hernandez-Martinez, 59 F.4th at 39 (quoting Matter of M-E-V-G-, 26 I. & N. Dec. 227, 237 (B.I.A. 2014)). To put more meat on those bones, a characteristic is considered immutable when "members of the group either cannot change [it], or should not be required to change [it], because it is fundamental to their individual identities or consciences." Montoya-Lopez v. Garland, 80 F.4th 71, 82 (1st Cir. 2023) (quoting In Re C-A-, 23 I. & N. Dec. 951,

_____

[7] At oral argument, the government also conceded it is "fine" proceeding with the "small business owners" PSG because such a PSG would still "not suffice."

- 16 -

955 (B.I.A. 2006)).  A group is considered particularly defined where it is "discrete and ha[s] definable boundaries -- it must not be amorphous, overbroad, diffuse or subjective." Paiz-Morales v. Lynch, 795 F.3d 238, 244 (1st Cir. 2015) (quoting Matter of M-E-V-G-, 26 I. & N. Dec. at 239).  And a group is considered socially distinct where its members "are set apart, or distinct, from other persons within the society in some significant way." Rivas-Durán v. Barr, 927 F.3d 26, 31 (1st Cir. 2019) (quoting Matter of M-E-V-G-, 26 I. & N. Dec. at 238).  In other words, to be socially distinct, the "proposed group must be perceived as such within" the asylum applicant's home country. Ramírez-Pérez v. Barr, 934 F.3d 47, 51 (1st Cir. 2019).

Applying this rubric to the record before us today, we readily conclude that Cabrera's "small business owners" PSG doesn't make the cut for a legally cognizable PSG.  Starting off with the immutability requirement, the agency, as explained above, determined that being a "small business owner" was not immutable. As for the parties, it appears that they are in agreement that being a "small business owner" is not immutable in the literal sense of the word; Cabrera can and did close her small business after the Mara 18 gang extorted and threatened her.  What the parties disagree upon is whether being a "small business owner" is immutable in the sense that Cabrera "should not be required to change [it], because it is fundamental to [her] individual

- 17 -

identit[y] or conscience[]." Montoya-Lopez, 80 F.4th at 82 (quoting In Re C-A-, 23 I. & N. Dec. at 955). To Petitioners, Cabrera's "entrepreneurial spirit" and her choice to "pursu[e] [her] livelihood as a small business owner [are] fundamental to [her] identit[y] and should not be required to be changed." To the government, Petitioners' "evidence did not demonstrate how closing a small business would be fundamental to [Cabrera's] identity for the purpose of social group cognizability."

Whether being a "small business owner" is a characteristic that should not be required to change because it is fundamental to an individual's identity or conscience is "an arguable point of debate," see Reyes Galeana v. Garland, 94 F.4th 555, 559 (6th Cir. 2024), with some courts believing it is not fundamental, see, e.g., Bonilla-Hernandez v. Garland, No. 22-6056, 2024 WL 1338769, at *1 (2d Cir. Mar. 29, 2024); Macedo Templos v. Wilkinson, 987 F.3d 877, 882-83 (9th Cir. 2021); Gomez De Sandoval v. U.S. Att'y Gen., 744 F. App'x 628, 632 (11th Cir. 2018); Bermudez-Merino v. Holder, 372 F. App'x 498, 500 (5th Cir. 2010), and some courts and jurists either punting on the question or believing it can be fundamental, see, e.g., Reyes Galeana, 94 F.4th at 559; Flores-Rios v. Att'y Gen., 848 F. App'x 72, 74 (3d Cir. 2021); Macedo Templos, 987 F.3d at 884-86 (Bea, J., concurring).

Setting aside the debate and assuming (again, favorably to Petitioners) that being a "small business owner" is an immutable

- 18 -

characteristic because it should not be required to change, Petitioners still lose on this point because -- as the government points out -- they have pointed to exactly zero evidence in the record to suggest that being a small business owner was fundamental to Cabrera's identity or conscience.  In fact, the record shows just the opposite.  For example, Cabrera didn't testify that she opened up her small business because of her "entrepreneurial spirit"; rather, she testified that she opened her business "hoping to [create] a better economic[] situation for [her] family."  The record also indicates that she was only a business owner for a few months between the spring and fall of 2017, and the record is otherwise devoid of any indication that she has opened or seeks to open a business in the United States or in Guatemala upon her return.  See Flores-Rios, 848 F. App'x at 74 (describing the petitioner's "contention that her experience of being a business owner is an immutable characteristic or a characteristic that she should not be required to change" as "a doubtful proposition, given that she was a business owner for only about six months and apparently has no plans to revisit that career choice").  Indeed, the only evidence in the record regarding her current employment indicates that she has been unemployed since 2017.  Accordingly, on this record, we spy no error in the agency's determination that

Cabrera's PSG did not bear an immutable characteristic and, therefore, the agency appropriately denied asylum.[8]

If more were needed (and we know it isn't, see, e.g., Zhakira v. Barr, 977 F.3d 60, 68 (1st Cir. 2020) (concluding asylum claim failed where proposed PSG did not satisfy one of the three PSG requirements); Ramírez-Pérez, 934 F.3d at 51-52 (same); Paiz-Morales, 795 F.3d at 244-45 (same)), the "small business owners" PSG fails on social-distinction grounds too. To explain, social distinction requires that the PSG "'be perceived as a group by society,' not merely by its persecutors." Espinoza-Ochoa, 89 F.4th at 231 (quoting Matter of M-E-V-G-, 26 I. & N. Dec. at 240). In other words, while the persecutors' view of the group as socially distinct can inform whether a particular society views the group as distinct, "[t]he relevant perspective is that of the rest of society." Id. at 231-32 (quoting Matter of M-E-V-G-, 26 I. & N. Dec. at 242).

_____

[8] At oral argument, Petitioners' counsel argued that this court could infer that being a business owner was fundamental to Cabrera's identity because she chose to become a business owner despite being well aware that the Mara 18 gang might target her. But where Cabrera's own testimony reflects she didn't open her business out of some entrepreneurial spirit fundamental to her identity that made her throw caution to the wind, but rather to make more money for her family (which we wish to acknowledge is commendable), there is no occasion for us to make such an inference. And in any event, because this argument made its debut at oral argument, it is waived. See Caz, 84 F.4th at 30.

Here, the testimony, sworn statements, I-589 and CFI documents, corroborating evidence, death certificates, and pictures did not explain how or why Guatemalan society views "small business owners" as a distinct group; rather, the evidence all went to whether the Mara 18 gang viewed "small business owners" as a distinct group. The only other evidence in the record -- the four country conditions reports -- makes the same mistake, describing generally how Guatemala has been plagued by violence (especially gang-related violence). As a matter of fact, the only mention of anything even halfway related to "small business owners" at all in these reports is the following two sentences: "Extortion in Guatemala City is rife, and it is mainly carried out by street gangs and copycat groups. Shops, large businesses, and the public transport sector have all been affected by this crime." This characterization of life in Guatemala may well be true, but this evidence does not satisfy Petitioners' burden on the social-distinction issue.

Petitioners' resist this conclusion by explaining that "Guatemala is a quintessential example of an 'underdeveloped' society [in] which . . . [b]usiness owners are . . . viewed by society to serve a distinctive purpose for the community and its economy." "Business owners," Petitioners explain, "are visibly and socially distinct from persons who are involved in other professional endeavors, such as government workers, factory

employees, and agricultural workers."  These arguments, however, don't persuade because they are, again, citation-free to any aspect of the record explaining how or why Guatemala views "small business owners" as a distinct group.  And because Petitioners point to no social-distinction-related evidence, we cannot conclude that the agency erred when it determined "small business owners" was not sufficiently socially distinct or that it erred in its ultimate denial of asylum.  See, e.g., Hernandez-Martinez, 59 F.4th at 39 ("Hernandez-Martinez also contends that his proposed group is socially distinct, because 'Guatemalan society perceives successful business owners as a distinct social group, easily identifiable from the vast majority of Guatemalan society, much of which lives in poverty.'  He does not, however, cite anything in the record to support this claim.  We therefore cannot conclude that the IJ's determination that wealthy business owners in Guatemala are not a sufficiently distinct group was reversible error."); Macedo Templos, 987 F.3d at 882 (same); Carcamo Estrada v. Barr, 804 F. App'x 29, 33 (2d Cir. 2020) (same); Betancourt-Aplicano v. Sessions, 747 F. App'x 279, 283 (6th Cir. 2018) (same); Davila-Mejia v. Mukasey, 531 F.3d 624, 629 (8th Cir. 2008) (same).[9]

---

[9] Before we move forward, we quickly dispense with one of Petitioners' other arguments on the asylum front.  They argue that the Sixth Circuit's unpublished decision in Zuniga-Martinez v. Garland, No. 21-3312, 2022 WL 2160668 (6th Cir. June 15, 2022), is

*Withholding of Removal*

Cabrera's application for withholding of removal requires comparatively much less analysis on our part to resolve. As the IJ correctly noted in her oral decision, "[w]ithholding of removal requires a showing that a[ noncitizen] is more likely than not to face persecution on account of a protected ground." Paiz-Morales, 795 F.3d at 245 (quoting Scatambuli v. Holder, 558 F.3d 53, 58 (1st Cir. 2009)). So, on the one hand, the requirements for asylum and withholding of removal are similar in the sense that a protected ground is a basic prerequisite for both forms of

---

on all fours with this case and demonstrates that Cabrera's PSG of "small business owners" is legally cognizable. We view that case differently. There, the petitioner was a small business owner in Honduras and was being extorted by a gang. Id. at *1-2. Before the IJ, the petitioner offered two PSGs, "Honduran small business owner[s]" and "female Honduran small business owner[s]," both of which the IJ found legally cognizable. Id. at *2. The IJ, nevertheless, denied relief on nexus grounds and the petitioner's inability to show that the Honduran government was unable or unwilling to protect her. Id. The BIA then affirmed the IJ's denial on nexus grounds. Id. For its part, the Sixth Circuit reversed the agency's determination on both nexus and the Honduran government's apparent inability or unwillingness to protect the petitioner. Id. at *4-6. The Sixth Circuit, however, never analyzed the cognizability of the petitioner's PSGs, seemingly accepting their cognizability without actually deciding the issue. Id. Accordingly, the (non-binding, mind you) Zuniga-Martinez decision is not relevant to the issue of cognizability before us today. Regardless, "[w]hether a particular social group is cognizable is a fact-based inquiry made on a case-by-case basis," Espinoza-Ochoa, 89 F.4th at 232 (alteration in original) (citation and internal quotation marks omitted), so just because an IJ with a different record before them concluded a "small business owners" PSG was cognizable does not require the same result here, especially in light of the record-related deficiencies highlighted above.

relief but, on the other hand, withholding's more-likely-than-not standard is higher than the standard required for asylum. See Scatambuli, 558 F.3d at 58. The "corollary" to all this is that where Cabrera did not satisfy her protected-ground burden as to asylum, she necessarily did not satisfy her burden as to withholding -- meaning the agency committed no error in denying such relief. Caz, 84 F.4th at 30.

*CAT Protection*

Last on our to-review list is Cabrera's application for CAT protection. Applicants for CAT protection must make a two-part showing: (1) it is "more likely than not" that they will be tortured if removed to a specific country, and (2) that torture will "be 'inflicted by or at the instigation of or with the consent or acquiescence of a public official acting in an official capacity or other person acting in an official capacity.'" Gomez-Abrego v. Garland, 26 F.4th 39, 46 (1st Cir. 2022) (first quoting 8 C.F.R. § 208.16(c)(2); and then quoting 8 C.F.R. § 208.18(a)(1)).

To remind, the BIA, upon de novo review, concluded that Cabrera's "evidence [wa]s insufficient to establish her burden of proof," because she "ha[d] not been tortured in the past by or with the acquiescence of a government official, and she ha[d] not shown that a public official would acquiesce to her torture by criminal gangs." "Evidence of widespread corruption and ineffective policing," the BIA added on, "are insufficient to

establish [Cabrera's] burden of proof." The only error in the BIA's analysis that Cabrera flags in her briefing to us is that the BIA allegedly "ignored the voluminous country conditions reports submitted in support of [Cabrera's] claim" -- documentation which, to Cabrera, "establishes gross, flagrant, and mass violations of human rights in Guatemala" and "demonstrate[s] that in many parts of Guatemala, the gangs are the de facto government, and that the police work with the gangs . . . [and] this amounts to government acquiescence." We are not convinced.

To begin, the record belies any assertion that the BIA ignored Cabrera's country conditions reports. The BIA's reference to "[e]vidence of widespread corruption and ineffective policing" was clearly a callback to Cabrera's country conditions reports, thus indicating that it did consider them. And more to the point, those "country conditions reports, standing alone, do not carry the day" and win Cabrera CAT protection, because "[a]lthough such reports are sometimes helpful to a[ noncitizen's] claim, their generic nature is such that they are rarely dispositive." Mendez-Barrera v. Holder, 602 F.3d 21, 28 (1st Cir. 2010). Indeed, we have cautioned repeatedly that generalized country conditions evidence (by itself) is not sufficient for a grant of CAT protection. See, e.g., Bazile v. Garland, 76 F.4th 5, 16 (1st Cir. 2023); Mendez-Barrera, 602 F.3d at 28. Here, Cabrera's briefing on her CAT claim is again citation-free to any part of

the record showing that she, personally, is at an individualized risk of torture with state acquiescence upon return to Guatemala. And our own careful review of the record didn't turn up anything that would suggest the agency's determination wasn't supported by substantial evidence. Without such particularized evidence, and reviewing for substantial record evidence, we cannot say that the BIA erred in denying Cabrera CAT protection. See, e.g., Bazile, 76 F.4th at 16; Gomez-Abrego, 26 F.4th at 46; Agustin v. Whitaker, 914 F.3d 43, 47 (1st Cir. 2019); Mendez-Barrera, 602 F.3d at 28.

## THE CONCLUSION

As the IJ indicated below, we "in no way condone what's happened to" Petitioners, but for the reasons discussed above, the petition is denied.